

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00288-CR

———————————————————

ANDREW COLBY LIVINGSTON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CR17-00284

Before Gabriel, Kerr, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant of the offense of continuous sexual abuse of a child and assessed punishment at life in prison. The trial court entered judgment in accordance with the verdict.

Appellant represented himself pro se at trial but is represented by counsel on appeal. Appellant raises two points on appeal. In his first point, Appellant argues that the trial court erred by failing to find that Article 38.23 of the Texas Code of Criminal Procedure required the suppression of incriminating sexual images contained on an SD card that a private person committed a criminal trespass to obtain. In his second point, Appellant argues that the trial court deprived him of the presumption of innocence when it did not allow him to approach the complainant—his daughter— while cross-examining her during trial.

We resolve Appellant's first point by holding that even if the trial court erred by failing to suppress the material obtained from the SD card, the error was harmless. The jury heard uncontested evidence that Appellant had sex with his daughter several times a week beginning when she was twelve years old and continuing over a period of three years. Appellant testified at trial and openly admitted his acts, justifying them by stating that his daughter wanted the sexual relationship, and in the face of his admissions claimed that he had never done anything malicious to her or had failed in

2

his duties as a parent. Indeed, Appellant argued that those who condemned him for having a multi-year sexual relationship with his daughter lacked empathy for him.

With respect to the second point, it was within the trial court's discretion to prevent Appellant from being in immediate physical proximity to his daughter while he cross-examined her. And even if the trial court's action was in error, it was harmless.

Accordingly, we affirm.

## II. Factual and procedural background

### A. The offense alleged against Appellant

Appellant was indicted for committing "two or more acts of sexual abuse against children younger than 14 years of age" that occurred "during a period that was 30 or more days in duration . . . from on or about February 17, 2013[,] through November 27, 2015." The acts that Appellant was alleged to have committed included penetration of the complainant's mouth by Appellant's sexual organ, penetration of the complainant's sexual organ by Appellant's sexual organ, and penetration of the complainant's sexual organ by Appellant's fingers and/or tongue.

### B. The State's case

At trial, the State presented several witnesses. The State's witnesses included the complainant; a forensic examiner who had interviewed the complainant; a sexual assault nurse examiner who had examined the complainant; Appellant's friend who had removed the SD card from a safe in Appellant's apartment and had turned it over

3

to police; and various law enforcement officers who had obtained possession of the card, had downloaded information from it, and had sponsored the introduction of exhibits created from material found on it.

The complainant testified that her father was not in her life when she was younger and that she had wanted to spend time with him. So when she was twelve, she moved in with her father and lived with him full time for three years. Eventually, the complainant began to sleep in the same bed with her father. The complainant testified that her father isolated her, that he began complimenting her on how attractive she was, and that he eventually began having sex with her. Until the relationship was exposed, Appellant had sex with the complainant as often as three times a week. In the complainant's words, the relationship "was like a basic marriage." The complainant also testified how Appellant had manipulated her by using pity as a control mechanism, had isolated her, and had required her to perform oral sex before taking her to buy food at fast-food restaurants.

The forensic examiner testified about how the complainant had described the abuse that she claimed Appellant had inflicted on her as follows:

Q. What acts did she describe to you of sexual abuse?

A. She described actual intercourse. She said that, you know, he put his penis in her vagina. She told me that it -- it initiated from the -- how it first initiated was he would wake -- she would wake up in the morning and his hand would be in her shirt. And then things just kind of progressed from there. She also gave incidents of her having to give him oral sex and then him performing oral sex on her.

4

Q. Did she tell you why she had to perform oral sex on him?

A. She said that he used that as a way to -- I don't know if she said "manipulate." But if she wanted to go eat at her favorite restaurants, when she said Subway or Cicis, that was the way that he would be able to get her to perform oral sex on her -- on him, is if she -- and he -- then he would take her to those restaurants.

The sexual assault nurse examiner also related what the complainant had told her about the relationship:

It's been like a marriage-type relationship with my dad. I was being forced, but it didn't feel like force because he was being good to me. I did all the cooking, cleaning, laundry[,] and everything. I wasn't allowed to leave. I was only allowed to take out the trash. It was a very controlled relationship. We had sexual intercourse from the time I was 12 years old, full vaginal penetration.

The nurse testified that her physical examination of the complainant produced findings that were consistent with the abuse the complainant reported.

The relationship between Appellant and the complainant came to light when Appellant was arrested for another charge and the complainant began living with a friend of Appellant. The complainant made an outcry to Appellant's friend and told him that Appellant had taken pictures while he was having sex with her. The photos were on an SD card locked in a safe in Appellant's apartment. Appellant's friend had a key and the combination to the safe and was told by Appellant that he could access the safe if he needed to remove something for the complainant. Appellant's friend did not know what to believe and wanted to see if the card actually had the images that the complainant had described. To be able to examine the card, Appellant's

friend arranged for his brother (also a friend of Appellant) to get Appellant out of his apartment. Appellant's friend then entered the apartment and removed the SD card from the safe. The photos on the SD card confirmed what the complainant had told Appellant's friend, and he immediately took the card to the police.

Before trial, Appellant sought to suppress the images on the card, arguing that his friend had committed a trespass by entering his apartment and that Article 38.23 of the Texas Code of Criminal Procedure requires the suppression of evidence obtained by a private person in violation of the law of the State of Texas. The trial court denied the motion, and images contained on the card were introduced at trial.

But the images obtained from the SD card were not the only corroboration of the complainant's claims and Appellant's acts offered during the State's case. The State introduced the recording of a call that Appellant had made from jail to another of his friends. That recording contained several incriminating statements. Appellant began the call by noting that he had written a letter to explain himself to his friend and that he could not say too much because the call was being recorded. Even after expressing concern about the call's being recorded, Appellant made the following statements during the call: (1) Appellant stated that the situation was not as bad as it looked, but it was pretty close to what it looked like; (2) he feared what had occurred would not be understood by the friend; (3) he quoted from the Bible for the proposition that it was better to marry than to burn with passion and that was all that "they" knew to do and "that's how it'[d] been for the last couple of years"; (4) other

6

people apparently knew about the relationship; (5) he had tried to prevent the relationship at first; (6) he hoped evidence obtained from his apartment would be thrown out; (7) he was going to do the best to defend himself; (8) in response to the statement by his friend that right is right and wrong is wrong, Appellant responded that he thought so as well at first; (9) in response to the statement about how a father should behave, Appellant responded that "it's hard to believe . . . you can be two things at once[,] but you can"; (10) he hoped that one of the jurors would understand his position because "all it takes is one"; and (11) he hoped that those who judged him would do so as they wanted to be judged.

A nurse practitioner who provided care to Appellant while he was jailed testified that he had written a note to her that stated, "I was in a three-year relationship with my daughter, who now never wants to see me again." This witness also testified that Appellant had told her essentially "that he was [the complainant's] sex slave or she would go turn him into the authorities if he didn't continue to do this to her."

## C.     Appellant's case

As noted above, Appellant chose to defend himself. The case he presented removed any doubt about what had occurred between him and the complainant. For example, Appellant called his mother to testify about how the complainant had misbehaved while she had lived with him and his mother. On cross-examination,

7

Appellant's mother testified that Appellant had told her that the charges against him were true.

Later, Appellant called the friend with whom he had had the jailhouse telephone conversation. That witness testified about the call and what he viewed as the admissions that Appellant had made during the call.

Appellant also called a person with whom he had been jailed. Appellant solicited testimony from this witness that "you told me that your daughter would -- that y'all were married."

At the conclusion of his case, Appellant testified on his own behalf. Appellant offered an almost forty-page narrative during which he not only freely admitted the sexual relationship that he had with his daughter but also sought to justify it and, at various points, to compliment his own behavior. The focus of his testimony emphasized the mistreatment that he had allegedly endured during the multi-year sexual relationship he had with his daughter and from the consequences of the relationship's discovery.

Appellant offered graphic testimony describing his view that his daughter was sexually attracted to him. He told the jury how his daughter had, in essence, begged him for the sexual aspect of the relationship. From Appellant's perspective, the problem was not his behavior but the inability of the outside world to empathize with how he felt:

> If there were no world to exist, there would be nothing to worry about. If all of you weren't here to judge me or look at me, you can't look through my eyes and you don't know how I feel and you never will. And you don't know how she felt[,] and you never will.

Appellant also criticized his daughter for attempting to use the relationship as a means of controlling him.

At another point, Appellant told the jury that he did not find his behavior to be wrong:

> I feel there are many wrong things I've done in my life, but I don't feel that this is specifically something that was wrong.
>
> It's very peculiar. It's very different. And it's very hard to grasp the mindset that either one of us would have had, but I don't believe that I am guilty of sexually abusing someone. I just don't. I love her. I care for her.

As he testified, Appellant elaborated on how his behavior was justified, how he had behaved properly during the relationship, and how he had been mistreated. Specifically, he testified about the following: (1) how he had taken good care of his daughter during the relationship; (2) how the relationship was not "one-sided," as evidenced by the fact that his daughter had initiated the sexual activities and that "she definitely wanted this relationship"; (3) how his daughter had misbehaved while she had lived with him; (4) how the relationship had come fully to light because investigators had "hounded" his daughter to speak about it when she had not wanted to; (5) how he was a helpful person; (6) how his daughter was a cold person who had encouraged him to kill himself; and (7) how he had not "cheated" on his daughter

9

during their relationship. Appellant then transitioned to a criticism of the investigation and how he had been wronged "in the sense that [he did not] believe [that the State] should have emotionally led [the jury] to how [they] should feel about what [they were] doing."

Appellant concluded his narrative with the suggestion that his daughter had been swayed in her feelings by others telling her that the relationship was improper and how the care he had demonstrated toward his daughter showed that he did not deserve to go to prison:

> It's said in the reports, so we have verification of it that it's not hearsay, that everyone had told her that this was gross, this was that or the other, and that -- and that I should know better. And I don't -- I still don't think anyone can imagine the situation through either one of our eyes.
>
> I -- I just cannot stress enough to how much I do care for her and how much I love her. And how much I would do anything for her, but *I don't think I deserve to go to prison for that. I've never done anything malicious to hurt her. I have done everything she's asked for me to do, and in the end, I still got pushed away.* [Emphasis added.]

On cross-examination, Appellant made no effort to deny his acts or their duration and openly admitted all of the elements of the offense alleged in his indictment. His only challenge to the State's questions was to repeat the theme that his daughter initiated the sexual activity:

> *Q.* So let me just get this straight. From the time that she lived with you in 2014 -- spring 2014 until her 14th birthday, you were having sex with her, right?
>
> *A.* What time in -- when are you saying --

*Q.* I'm asking you a specific question.

*A.* What date in 2014?

*Q.* Okay. So spring 2014, when she came to live with you on the weekends until about [complainant's birthday], 2015, when she turned 14, you were having sex with your daughter; is that right?

*A.* I was having sex with [the complainant].

*Q.* Your daughter? Let's be clear here, [the complainant] is your daughter. We're not going to play that game, [the complainant] is your daughter?

*A.* I'm saying that I had sex with [the complainant], and I'm answering your question.

*Q.* Okay. So that whole time you were having sex with her, which means that she was under 14, right? **And you put your penis in her vagina, right?**

*A.* **Yes.**

*Q.* **And then you also put your penis in her mouth?**

*A.* **Yes.**

*Q.* **Right? And then you --**

*A.* **Actually, no. She put the penis in her mouth.**

*Q.* **Okay. So she did it then?**

*A.* **Yes.**

*Q.* Okay. So -- and then you put your mouth on her vagina --

*A.* Yes.

*Q.* -- during that time?

11

*A.* Yes.

*Q.* This is your daughter we're talking about here?

*A.* This is who was biologically my daughter, that I have never known, yes. [Emphasis added in bold.]

## D. The parties' arguments at the guilt–innocence stage

The State waived its closing argument. During Appellant's closing argument, he did not step back from his efforts to convince the jury that he had acted appropriately. Instead, his argument was a plea that the members of the jury should protect his rights and their own rights by not sanctioning the actions of law enforcement and of his friend who had entered his apartment to obtain the SD card. He also complained that he had received an unfair trial.

An example of Appellant's focus during his closing argument is as follows:

> I feel like I didn't get a fair trial . . . . I took the stand so you could hear my point of view because, obviously, I wasn't getting anywhere with my witnesses.
>
> But plenty of things have happened that you've seen over the course of an investigation that you know is not right. So it's not just about did an act happen, did it not happen? It's about did the case come about correctly? And I don't believe it did.

The State responded to Appellant's argument complaining about his friend's actions in obtaining the SD card by telling the jury to remove the images from the SD card from the mix in determining Appellant's guilt. As the State emphasized,

> We knew the whole story and everything matched up[;] everything was corroborated. We have the recording from his friend . . . where [Appellant] confessed. We have him confessing to the nurse practitioner

12

at the jail. *So you've heard all of that, before you saw a single photo. Okay? So let's just say the photos don't exist, and you can still find him guilty.*

*And also, we can't forget the fact that he just sat right here and told y'all that it happened. He told y'all the whole thing[,] and I went through the indictment with him on all of the elements[;] and he said, yes, all of those things happened. So you don't even need the photos. Don't even -- fine, disregard the photos. He's still guilty.* [Emphasis added.]

After hearing the parties' arguments, the jury retired and found Appellant guilty of continuous sexual abuse of the complainant.

## E. Evidence and arguments during the punishment phase

The State put on no additional testimony during the punishment phase. Appellant then offered his own testimony that emphasized what he saw as inconsistencies in the testimony during the guilt–innocence stage of the trial and how he considered himself a loving person. The State then cross-examined Appellant about other offenses he was accused of, including assaulting a jailer and touching other children. The State's cross-examination also focused on Appellant's view that he did not consider anything that he had done to be malicious and his claim that he had isolated his daughter for her own protection. Appellant again called his mother to testify about what a helpful person he is.

The State's opening statement in punishment consumes only two pages of the record. The State's theme was that the complainant had been given a life sentence because of Appellant's actions and that he should receive a correspondingly long sentence. The State made two passing references to "the pictures."

Appellant claimed in his opening statement that the State had told his prior lawyer that it wanted him to die in prison. Appellant stated that he "work[ed] emotionally different" and that he was not "a harm to society." Appellant challenged whether his actions would have a lasting impact on the complainant. The only possible harm to the complainant that Appellant could see was the regret that she might have in not being able to reach out to him. Appellant candidly stated his views on how his conduct might have impacted the complainant by telling the jury, "I don't see any harm to her." Appellant again highlighted how he did not force his daughter to have sex with him: "She told you herself, I never made her, ever made her, and -- nor would I." And he apparently forgave his daughter by noting, "And I will never be mad at her *for what she has done*." [Emphasis added.]

In Appellant's view, he was the one who had been forced into the relationship, but even though he was the one suffering the consequences, he had no regret: "If I wouldn't have participated in the first place, it couldn't have been used as a threat against me. But it happened and it did. But despite the sentence, I still don't regret being with her. I don't and I never will."

Appellant then highlighted the conditions under which he had been jailed and asked the jury to focus on what he had been through. He concluded by noting that he had found God and asked that he be given the minimum sentence of twenty-five years because he would like to breathe free air again.

14

In response to Appellant's argument, the State asked the jury to consider several of the themes that Appellant had raised during his argument. It noted the conditions under which Appellant had held the complainant, the way he had treated her, and his argument that he was the victim because of what had occurred. The State emphasized that Appellant's abuse of the complainant had begun when she was twelve years old and that it was insulting for Appellant to argue that his actions had no effect on her. The State concluded by arguing that the only sentence acceptable to the community for Appellant was life and that only this sentence would ensure that Appellant never committed abuse against another victim. During this argument, no mention was made of the images contained on the SD card.

On the issue of punishment, the trial court instructed the jury that "[t]he punishment for a felony of the first degree shall be confinement in the Institutional Division of the Texas Department of Criminal Justice for life, or for any term of years not more than 99 years or less than 25 years." The jury assessed Appellant's punishment at life in prison.

### III. Appellant's first point—images from the SD card should have been suppressed

### A. Why we assume without deciding that the failure to suppress the images was error

Appellant's first point claims that the trial court erred by failing to suppress the images obtained from the SD card. Appellant's argument is that his friend who obtained the card committed a criminal trespass by entering his apartment and that

Article 38.23 of the Code of Criminal Procedure required suppression of the images because the card was obtained in violation of Texas law. The State responds that Appellant's friend took the SD card for the purpose of giving it to the police and that acting with this intent made the evidence admissible whether he had obtained it as a result of a criminal trespass or not. We will assume without deciding that the actions of Appellant's friend constituted a violation of Article 38.23 and will hold that any error in the admission of the images was not harmful.

We have already noted the events leading up to the SD card's discovery. In summary, the complainant began living with Appellant's friend after Appellant was arrested on another charge. The complainant made an outcry to Appellant's friend and told him that sexual images of her were contained on an SD card located in a safe in Appellant's apartment. Appellant's friend had the key and the combination to the safe and testified that he had consent from Appellant to enter the safe to obtain material that involved the complainant. However, Appellant's friend acknowledged that Appellant would not have consented for him to enter the apartment to obtain the card.[1] To gain access, Appellant's friend had his brother arrange for Appellant to

---

[1]Specifically, Appellant's friend testified at the suppression hearing as follows:

*Q. (BY [DEFENSE COUNSEL])* Okay. So you'll admit to me that you know [Appellant] would not have consented [to] you[r] entering the house and taking the disk out?

*A.* I believe he would not have consented to me seeing what was on it.

16

leave his apartment so that Appellant's friend could access the safe while Appellant was gone. The trial court entered a finding that "[a]fter being told of the sexual[ly] explicit photographs, [Appellant's friend] entered [Appellant's] apartment *without his knowledge or consent* and recovered the photographs." [Emphasis added.]

However, the evidence also bore out Appellant's friend took the SD card to determine if it contained incriminating images that should be turned over to law enforcement. When the images confirmed the complainant's outcry, Appellant's friend immediately delivered the SD card to law enforcement. The trial court entered the following findings with respect to Appellant's friend's intent and actions:

4. At the time of entering the apartment, [Appellant's friend] had the intention of turning the photographs over to law enforcement.

5. Immediately after verifying that the contents of the SD card were criminal in nature and verifying that the child victim was telling the truth about the nature of the photographs, [Appellant's friend] contacted law enforcement at about 1:00 a.m.

6. The next morning, approximately 7 hours later, [Appellant's friend] met with an investigator and handed over the SD card to the Gainesville Police Department.

---

*Q.* He would not have consented to you[r] taking possession of the disk?

*A.* No, sir.

*Q.* Then I just want to make sure that that "no, sir" meant [Appellant] would -- if you had asked [Appellant]: [Appellant], I want to see this SD card, you believe he would have said no, correct?

*A.* I believe he would not have shown me.

17

The trial court concluded that the actions of Appellant's friend did not violate Texas law because "when a private individual takes property that is evidence of a crime, without the consent of the owner and with intent to turn the property over to law enforcement, the conduct may be non-criminal" and "[Appellant's friend's] conduct was non-criminal and the evidence is admissible because [Appellant's friend] had the clear intention of turning the evidence over to law enforcement."

Appellant's brief contends that the trial court erred because it based its decision on cases cited by the State that focused on whether his friend's actions constituted theft. Those cases are in inapplicable in Appellant's view because they involved actions of a person who "was lawfully in the place where the evidence was taken." Appellant's argument continues that the images should have been suppressed in this case because his friend was not lawfully in his apartment because he had committed a criminal trespass by entering it.[2]

_____

[2]Section 30.05(a) of the Penal Code states,

(a) A person commits an offense [of criminal trespass] if the person enters or remains on or in property of another, including residential land, agricultural land, a recreational vehicle park, a building, or an aircraft or other vehicle, without effective consent and the person:

    (1) had notice that the entry was forbidden; or

    (2) received notice to depart but failed to do so.

Tex. Penal Code Ann. § 30.05(a).

We find ourselves faced with a muddle of interpretations of the statute—Article 38.23 of the Texas Code of Criminal Procedure—which is at the core of Appellant's complaint. Article 38.23 is a unique creation of Texas law that applies an exclusionary rule not only to the actions of the government but also to private persons. The statute provides that

> [n]o evidence obtained by an officer or *other person* in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex. Code Crim. Proc. Ann. art. 38.23(a).

In support of the argument that there is no violation of Article 38.23 when a private individual takes property in violation of the law, so long as the person takes it with the intent to turn it over to law enforcement, the State relies on *Jenschke v. State*, 147 S.W.3d 398 (Tex. Crim. App. 2004). *Jenschke* holds that

> when a person who is not an officer or an agent of an officer takes property that is evidence of [a] crime, without the effective consent of the owner and with the intent to turn over the property to an officer, the conduct may be non-criminal even though the person has intent to deprive the owner.

*Id.* at 402. Commentators read *Jenschke*'s rationale as being

> applied to theft the "justification" of "necessity" as set out in section 9.22 of the Penal Code. Under this provision, conduct is not criminal if it [is] motivated by the actor's reasonable belief that the conduct is immediately necessary to avoid an imminent greater harm—in *Jenschke*, a criminal's avoidance of arrest, prosecution, and punishment. A harm is greater if "the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm ought to be prevented by the law prohibiting the conduct."

19

George E. Dix & John M. Schmolesky, 40 *Texas Practice: Criminal Practice & Procedure* § 7:42 (3d ed. 2019).

But the same commentators question whether *Jenschke*'s rationale has survived subsequent opinions from the Texas Court of Criminal Appeals. *Id.* Specifically, the commentators focus on the effect of *Miles v. State*, 241 S.W.3d 28 (Tex. Crim. App. 2007). *Miles* surveyed case law interpreting Article 38.23 and determined that the private person's conduct fell within the scope of what was permissible for a police officer to do:

> [The] rule—that a private person can do what a police officer standing in his shoes can legitimately do, but cannot do what a police officer cannot do—would explain the outcome in each case and is consistent with the purpose of Article 38.23. We conclude that the historical rationale for including unlawful conduct by an "other person" under the Texas exclusionary statute is best explained and implemented by this rule.

*Id.* at 39 (footnote omitted). The Court of Criminal Appeals has also clarified that *Miles* and other cases do not support "the idea that Article 38.23 extends the Fourth Amendment to private citizens acting in a private capacity." *State v. Ruiz*, 577 S.W.3d 543, 547 (Tex. Crim. App. 2019). But that holding does not signal whether *Jenschke*'s rationale—that appears to give a private person a justification above and beyond what a law enforcement officer would have—is still viable.[3]

---

[3]The cases that Appellant cites in support of his argument—that when a private person obtains evidence as the result of a criminal trespass, the evidence should be suppressed under Article 38.23—all predate *Jenschke* and provide no guidance in determining the continued viability of *Jenschke*'s rationale. *See, e.g.*, *McCuller v. State*,

20

We will not try to determine the viability of *Jenschke*'s rationale in this appeal. This appeal is an extraordinary situation. Appellant admitted the elements of the offense but then argued that he should not be judged by conventional rules of morality and should be acquitted to protect against the improper acts of his friend and law enforcement. Because of this approach, we conclude, as explained below, that any error resulting from the admission of the images from the SD card is harmless.

## B.  The harm analysis that we apply to Appellant's first point

The first step in our harm analysis is to determine the standard to apply. Texas Rule of Appellate Procedure 44.2 governs the harm analysis in criminal cases, but the rule contains two standards depending on whether the error is constitutional or of a different type. *See* Tex. R. App. P. 44.2. When the "appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). For error that is not of a constitutional magnitude, "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b).

Appellant's arguments implicate the violation of a statute—Article 38.23 of the Code of Criminal Procedure; thus, we would normally be inclined to utilize the

---

999 S.W.2d 801 (Tex. App.—Tyler 1999, pet. ref'd) (op. on reh'g); *State v. Hobbs*, 824 S.W.2d 317 (Tex. App.—San Antonio 1992, pet. ref'd).

standard of Rule 44.2(b). But a recent opinion from the Court of Criminal Appeals includes a concurrence that noted that the court's prior precedent appears to require the more strenuous constitutional harm analysis when addressing the failure to exclude evidence under Article 38.23. *See Dixon v. State*, 595 S.W.3d 216, 225–26 (Tex. Crim. App. 2020) (Hervey, J., concurring) (citing *Love v. State*, 543 S.W.3d 835, 845 (Tex. Crim. App. 2016)). Though the concurrence urges the Court of Criminal Appeals to overrule the precedent that analyzed a violation of a statute for constitutional harm, we follow the state of the law as we understand it to be and analyze Appellant's claim based on the alleged violation of Article 38.23 for constitutional harm.

We recently detailed how we conduct a harm analysis when dealing with constitutional error. *See Olivas v. State*, No. 02-14-00412-CR, 2020 WL 827144, at *5 (Tex. App.—Fort Worth Feb. 20, 2020, pet. ref'd) (mem. op. on remand, not designated for publication). To summarize,

> [c]onstitutional error requires us to reverse the conviction unless we determine beyond a reasonable doubt that the trial court's denial of the motion to suppress did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a); *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error [is] not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

*Id.*

Our analysis goes beyond the question of whether the evidence supports the verdict; the focus should not be the propriety of the trial's outcome. *Love*, 543 S.W.3d at 846. Instead, we must balance all that occurred during the trial to analyze whether there is a "'reasonable possibility' that the error might have contributed to the conviction." *Id.* A sampling of the factors we should review are "the nature of the error, the extent to which it was emphasized by the State, its probable collateral implications, the weight probably placed on the error, and whether declaring it harmless would be likely to encourage the State to repeat the error." *Freeman v. State*, No. 01-18-00310-CR, 2020 WL 894453, at *7 (Tex. App.—Houston [1st Dist.] Feb. 25, 2020, pet. ref'd) (mem. op., not designated for publication). "This, however, is not an exclusive list of considerations. Instead, we take into account any and every circumstance apparent in the record that logically informs a determination whether, beyond a reasonable doubt, this particular error contributed to the conviction or punishment." *Love*, 543 S.W.3d at 846. Our evaluation of all these factors must be done in a "neutral, impartial, and even-handed manner"; we do not review the evidence "in the light most favorable to the prosecution." *Olivas*, 2020 WL 827144, at *5 (citing *Balderas v. State*, 517 S.W.3d 756, 810 (Tex. Crim. App. 2016) (Alcala, J., dissenting)).

But the existence of overwhelming evidence establishing an appellant's guilt is not ignored in our harm analysis. "While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in

23

question can be a factor in the evaluation of harmless error." *Wesbrook*, 29 S.W.3d at 119; *see also Calvert v. State*, No. AP-77,063, 2019 WL 5057268, at *37 & n.154 (Tex. Crim. App. Oct. 9, 2019) (not designated for publication) (citing *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002)).

## C.   Why we conclude the failure to suppress images from the SD card was harmless

Here, we have the necessary assurance that there is no reasonable possibility that the arguably erroneous admission of images from the SD card contributed to Appellant's conviction for the continuous sexual abuse of his daughter. To claim harm, Appellant's brief catalogs only the testimony of the witnesses presented during the State's case. After this myopic portrayal of the record, Appellant argues that the photos found on the SD card surely had a harmful effect on the jury's verdict and the punishment he received because the State's case turned on the complainant's credibility. In Appellant's view,

> [t]here was little, other physical evidence corroborating [the complainant's] allegations entered into evidence. A number of witnesses . . . were called for at least partially[] the purpose of reciting what they had been told by [the complainant]. Whether or not their testimony was to be believed by the jury again depended on the credibility of [the complainant]. *It would be much easier for a jury to convict on, essentially, the allegation of a single witness, with the admission of the unlawfully obtained, graphic photos.* [Emphasis added.]

Appellant can make an argument that the jury's guilty verdict "essentially" turned on the credibility of the complainant only by entering an alternate reality where the jury did not hear his testimony. But here Appellant admitted to the primary

portions of the indictment, i.e., the conduct that constituted elements of the offense and the period of time that the conduct occurred. Even if he had not done so, the record offered much more than the complainant's testimony to establish his guilt. The State's case included the admissions that Appellant made during the jail call and his characterization of himself as his daughter's sex slave. Appellant's case added more admissions, including his admission to his mother that the abuse had occurred.

Nor was there a suggestion by the State to the jury that their verdict hinged on the existence of the images. To the contrary, after Appellant made his argument that the jury should find him not guilty because the images from the SD card were improperly obtained, the State told the jury to take the images out of its consideration in determining Appellant's guilt.

Finally, we can see no purpose in holding that there was harmful error in an effort to deter future conduct by the State. The State had no hand in the acts that initially uncovered the images on the SD card.

We can determine beyond a reasonable doubt that the trial court's failure to suppress evidence did not contribute to a conviction. With the admissions made by Appellant both before trial and during his testimony, the need for corroboration of the relationship that might have been provided by the images dropped away.

But Appellant also argues that the material found on the SD card must have had an impact on his punishment. The extent of his argument is that

> [t]he photographs likely had a substantial and injurious effect on the punishment verdict of the jury. The State did not call additional witnesses during the punishment phase of the trial. The appellant was sentenced to life, the maximum sentence allowed by law.

The jury did assess the maximum sentence in this case. Further, images of the type removed from the SD card would under less extraordinary circumstances have a potential to inflame a jury. Here, however, the jury heard from a person whose defense consisted of a determined effort to justify a multi-year sexual relationship with his daughter that began when she was twelve years old. Rather than expressing any sympathy for what the child had endured at his hands, Appellant apparently considered himself the victim of the child's actions and of society in general for its failure to sympathize with the justifications he had offered for the relationship.

Further, though the State made a passing reference to the "pictures" during the opening statement that it made during the punishment phase, the theme of its case was that Appellant had potentially ruined his daughter's life. Appellant responded and repeated many of the themes he had presented throughout the trial. He did not blame himself for what had occurred because he was allegedly only doing what his daughter wanted him to do and he had to submit to the relationship to protect himself from her threats. In his view, he posed no harm to society and had done no harm to his daughter. In his very words, he had no regrets. To the contrary, he asked the jury to focus on the suffering he had endured from the conditions under which he had been jailed. He concluded his argument with a final plea asking that the jury give

him sympathy in consideration of "all [*he* had] been through, what all [*he* will] go through, and the fact that [*he* would] like to breathe fresh air again, just like the rest of you do on a day-to-day basis."  [Emphasis added.]

The State responded to this argument without any mention of the images removed from the SD card.  The State's argument emphasized Appellant's behavior while jailed, the allegation that he had touched other children, and how he had isolated his daughter and had physically abused her.  The State's argument also emphasized Appellant's statement that he was not mad at her for what she had done.  The State ended its argument by asking for a life sentence because "[t]hat's the only thing that's acceptable for our community, and *that's the only thing that we can do to make sure that he never gets out and does something like this to anybody else*."  [Emphasis added.]

In essence, Appellant not only failed to express any remorse for his actions or sympathy for his victim, but he also viewed himself as basically faultless and as a victim.  He considered negative views of a multi-year sexual relationship that began when his daughter was twelve as not reflecting badly on him but instead reflecting a lack of sympathy and understanding on the part of those judging him.  Such an argument seems tailor-made to convince the jury that Appellant should receive a life sentence to ensure that he would not do to someone else what he considered appropriate to do to his daughter.

In the extraordinary circumstances of this case, we are able to determine what we might not be able to determine in a case without a single-minded campaign by a

defendant to do almost everything possible to convince a jury that he should receive the maximum punishment that could be assessed. Thus, even if the trial court committed constitutional error by failing to suppress the images recovered from the SD card, we determine beyond a reasonable doubt that those materials did not contribute to the jury's assessment of a life sentence as Appellant's punishment.

We overrule Appellant's first point.

## IV. Appellant's second point—the refusal by the trial court to permit Appellant to approach the complainant while he was cross-examining her

### A. Appellant's contention that the trial court's actions deprived him of the presumption of innocence and why we reject that contention

In his second point, Appellant contends that he was deprived of the presumption of innocence when the trial court would not let him approach the complainant while she testified but later allowed him to approach other witnesses. Appellant made no objection to the trial court's actions but argues on appeal that no objection was required because the action was fundamental error. We overrule Appellant's second point because the trial court had the discretion to address the emotionally charged situation of how close in physical proximity Appellant could come to the complainant while he cross-examined her. Not allowing Appellant to come within touching distance of the complainant was not so inherently prejudicial that the trial court's act constituted error. And even if it were error, it was harmless.

**B.     The exchange with the trial court that Appellant complains of**

The exchange that Appellant claims was error occurred while he cross-examined the complainant. Though representing himself, Appellant had standby counsel assisting him. At one point, Appellant referenced a statement that the complainant had made in a document, and the State objected to Appellant's reading from a document not admitted into evidence. This prompted the following inquiry by Appellant and instructions from the trial court:

> *Q. (BY [APPELLANT])* In your statement here with [prior defense counsel], it says that you had admitted --
>
> *[PROSECUTOR]:* Your Honor, I'm going to object to hi[s] reading from a document that's not been admitted into evidence.
>
> *[APPELLANT]:* Would you prefer I come up there and present this.
>
> *THE COURT:* No.
>
> *[APPELLANT]:* Can [standby counsel] come there and present this?
>
> *THE COURT:* He can walk something for you, but he's not going to do the -- try to admit it into evidence for you. So what do you want [standby counsel] to do?
>
> *[APPELLANT]:* Well, I want to admit it into evidence. I have to have --
>
> *THE COURT:* Then you need to have it marked.
>
> *[APPELLANT]:* Okay.

*THE COURT:* And then you need to -- you know -- you chose to represent yourself.

*[APPELLANT]:* That's why I'm asking if I can come up there[,] and you told me no.

*THE COURT:* [Standby counsel] can do your leg work.

*[APPELLANT]:* Okay.

*THE COURT:* But you're not approaching this witness.

*(Defendant's Exhibit No. 1 marked.)*

*THE COURT:* Now, what do you want [standby counsel] to do?

*[APPELLANT]:* I would like for him to ask the witness if she recognizes the statement --

*THE COURT:* He can't ask her. He can show it to the witness.

*[APPELLANT]:* Can you show it to her?

*[STANDBY COUNSEL]:* (Tenders.)

*THE COURT:* There's two pages.

The trial court allowed Appellant to approach other witnesses.

## C. Why the trial court acted within its discretion by refusing to permit Appellant to approach the complainant

Appellant contends that the trial court violated Texas Code of Criminal Procedure Article 38.05's prohibition that a trial judge shall not "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case." *See* Tex. Code Crim. Proc. Ann. art.

38.05. In Appellant's view, the trial court's comments during the episode quoted above struck at his presumption of innocence in the following way:

> The appellant was presumed innocent during the course of the trial. The trial court['s] refusing to allow the appellant to approach the alleged victim for the purpose of offering evidence, while allowing him to approach other witnesses, eroded the presumption. In saying "you are not approaching this witness," the trial court was conveying to the jury [that] the appellant somehow posed a danger to the victim if he were allowed to approach her. This remark conveyed to the jury the court's opinion of the appellant and his relationship with the alleged victim in violation of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. [Ann. art.] 38.05. This was especially emphasized given the contrast between what the appellant was allowed to do in the presentation of his case with [the complainant] versus what he was allowed to do with other witnesses.[4]

The trial court faced a unique situation where a sixteen-year-old witness was being cross-examined by her own father, whom she had accused of having a multi-year sexual relationship with her. During the cross-examination, Appellant was not only trying to undermine her testimony but also wanted to come into immediate physical proximity to her, creating a potentially fraught situation.

---

[4]Appellant contends that he was not required to object to the trial court's statement in order to preserve error because the statement constituted fundamental error under the Court of Criminal Appeals's holding in *Blue v. State*, 41 S.W.3d 129, 131–32 (Tex. Crim. App. 2000) (plurality op.). The Court of Criminal Appeals has concluded that Texas no longer follows the fundamental-error doctrine and has categorized a violation of Article 38.05 as a category two *Marin* right that may only be expressly waived. *See Proenza v. State* (*Proenza II*), 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) (affirming in part and reversing and remanding in part *Proenza v. State* (*Proenza I*), 471 S.W.3d 35 (Tex. App.—Corpus Christi–Edinburg 2015)); *see also Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997). We presume, without deciding, that Appellant's failure to object did not forfeit Appellant's claim of error.

The trial court had the discretion to decide how it would address the situation when it arose. Generally, a trial judge has discretion regarding how to control a trial and to protect a witness while testifying. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) ("A trial judge has broad discretion in maintaining control and expediting the trial."); *see also* Tex. R. Evid. 611(a)(3) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: . . . (3) protect witnesses from harassment or undue embarrassment.").

And there is an added measure of discretion when a "fragile" witness, such as a sexually abused child, is testifying. For example, the measures go so far as not requiring a fragile witness to testify face-to-face before her alleged abuser. *See Forkert v. State*, No. 11-16-00279-CR, 2018 WL 4840704, at *3 (Tex. App.—Eastland Oct. 4, 2018, no pet.) (mem. op., not designated for publication) ("The ability to present witness testimony through [closed-circuit television] or other digital means has been extended to pregnant women and other fragile or absent witnesses."); *see also* Tex. Code Crim. Proc. Ann. art. 38.071, § 3(a) (permitting testimony of child victim by closed-circuit television).

The record reflects that the complainant had described herself as "shaken up" and nervous while testifying. In that circumstance and because of the unique circumstances in this case in which Appellant represented himself and was thus doing the questioning, the trial court certainly had some measure of discretion to protect a

nervous complainant from being within touching distance of the person that she claimed had abused her.

The question then becomes whether the trial court's exercise of its discretion was error. To answer that question, we have to refocus Appellant's contention. Appellant tries to focus on the trial court's comments to shoehorn his argument into Article 38.05's prohibition on improper comments, but his argument instead centers on the trial court's action in not permitting Appellant to approach the witness. The statement where the trial court told Appellant that he could not approach the complainant merely confirmed the action that the trial court was implementing. To address the proper focus of the complaint, we ask whether the trial court's action in not permitting Appellant to approach the complainant despite permitting him to approach other witnesses and its statement that "you're not approaching this witness" actually conveyed, as Appellant contends, that he was a danger to the complainant and also "conveyed to the jury the court's opinion of the appellant and his relationship with the alleged victim."

To determine the standard to apply in determining whether the trial court's act was error, we look to the standard set out by the Court of Criminal Appeals when determining the prejudice that results from protective measures for a witness testifying by video. *See Marx v. State*, 987 S.W.2d 577, 581–82 (Tex. Crim. App. 1999). In the view of the Court of Criminal Appeals, even the measure of permitting a child to testify by such a means as closed-circuit television does not deprive an appellant of

the presumption of innocence because it does not tend "to brand [an] appellant with an unmistakable mark of guilt." *Id.* at 582.

The Texarkana Court of Appeals applied the holding of *Marx* when it examined the prejudicial effect of the extreme act of permitting a witness to testify in disguise and the impact that it had on the presumption of innocence. *See Romero v. State*, 136 S.W.3d 680, 683, 689–90 (Tex. App.—Texarkana 2004), *aff'd*, 173 S.W.3d 502 (Tex. Crim. App. 2005). To determine the standard to apply, the Texarkana Court looked to the question posed by *Marx* regarding whether the practice would brand a defendant with the unmistakable mark of guilt. *Id.* *Romero* answered the question with a commonsense determination of what the jury would infer from the act and whether the inference that the jury must draw was inherently prejudicial:

> The Texas Court of Criminal Appeals has written that, if a particular practice at trial "tends to brand the defendant with an unmistakable mark of guilt," it impairs the presumption of innocence in violation of the Due Process Clause. [*Marx*, 987 S.W.2d at 581] (citing *Holbrook*[ *v. Flynn*], 475 U.S. [560,] 570–71, 106 S. Ct. 1340[, 1346–47 (1986)]). "If, on the other hand, the challenged practice need not be interpreted by jurors as a sign that the defendant is particularly dangerous or culpable, it is not inherently prejudicial and does not deny due process." *Id.* The question we must address, therefore, is whether [the State's witness's] disguise—insisted on because of his fear of retaliation—improperly communicated to the jury that [appellant] was, in fact, dangerous or culpable.
>
> Courts addressing this issue in the past have indicated that "reason, principle, and common human experience" must guide the determination of whether a particular practice is presumptively prejudicial. *Holbrook*, 475 U.S. at 569, 106 S. Ct. [at 1346]; *Estelle*[ *v. Williams*], 425 U.S. [501,] 504, 96 S. Ct. 1691, [1693 (1976)]; *Marx*, 987 S.W.2d at 581. That is, courts must ask whether the scene presented to

34

jurors was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial. *Holbrook*, 475 U.S. at 572, 106 S. Ct. [at 1347]. If it is equally probable that jurors will infer from the particular practice at issue some meaning other than the one suspected by the defendant, then the answer to this question is no. Depending on the circumstances of the case, another possibility is that jurors will infer nothing at all from the questioned practice. *See id.* at 569, 106 S. Ct. [at 1346].

*Id.*

We conclude that the trial court's action in not permitting Appellant to approach the complainant did not compel the prejudicial inference that Appellant contends it did. In this case, we were not in the courtroom and do not know how the complainant manifested that nervousness that she stated she was experiencing to the trial court and the jury. The trial court was the one with the ability to observe the witness and gauge how to address the discomfort she understandably felt and then to exercise the discretion to address the situation. A restriction that prevented Appellant from coming within touching distance of the complainant is not so inherently prejudicial that it compelled the jury to conclude that Appellant was guilty. Nor did it necessarily convey a fear that Appellant posed a danger to the complainant. It could well have conveyed nothing more than that the trial court did not want to heighten the complainant's nervousness by having Appellant standing over her. And there is a possibility that it conveyed the trial court's concern about how placing the two in close proximity might produce an emotional outburst from the complainant directed at Appellant.

The trial court had to exercise its discretion to deal with the situation it faced with the complainant's being questioned by the very person she had accused of the abuse. We do not know what the jury inferred when the trial court did not permit Appellant to be in close proximity to the complainant, and that is the point of resolution of Appellant's second point: the trial court's act was not so inherently prejudicial that it must have, as Appellant contends, conveyed the trial court's opinion that Appellant was dangerous or guilty.

**D.    Why any error in not permitting Appellant to approach the complainant was harmless**

Even if we concluded that the trial court had erred by refusing to permit Appellant to approach the complainant when it permitted him to approach other witnesses, we would conclude the error was harmless. Though we apply a different standard to analyze harm than we did in our review of Appellant's first point, we again reject Appellant's contention that the trial court's action harmed him because it influenced the jury in accepting that the complainant's story was credible. Previously, we catalogued Appellant's admissions that confirmed point by point the complainant's testimony and the unique arguments he made in his attempt to blunt the effect of those admissions. Even if the trial court's action may have conveyed a negative opinion about Appellant and the sexual relationship that he had with his daughter, we cannot accept the argument that this perceived opinion, rather than Appellant's admissions, swayed the jury.

Again, we must sort out what harm standard to apply. Appellant argues for the constitutional harm standard under Rule 44.2(a). His position appears contrary to the Court of Criminal Appeals's opinion in *Proenza II* that we referenced above. *Proenza II* faulted the court of appeals for utilizing a constitutional harm standard when an appellant relied on error stemming from a statutory error—that error occurring when the trial court made a comment that violated Article 38.05's prohibition on remarks calculated to convey the trial court's opinion of the case to the jury. 541 S.W.3d at 801. *Proenza II* remanded the case to the court of appeals to conduct a harm analysis using the non-constitutional harm standard of Rule 44.2(b). *Id.* at 801–02. Here, Appellant also argues that the trial court's acts and comment violated Article 38.05. Thus, relying on the guidance of *Proenza II*, we will apply the 44.2(b) standard.

On remand in *Proenza*, the Corpus Christi–Edinburg Court of Appeals exhaustively detailed the 44.2(b) standard. *Proenza v. State (Proenza III)*, 555 S.W.3d 389, 398 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.). The overarching standard for 44.2(b) is found in the rule's statement that "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b).

The court of appeals in *Proenza III* offered two formulations of how to determine whether the error had an effect on a substantial right:

> "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Ellis v. State*, 517 S.W.3d 922, 931 (Tex. App.—Fort Worth 2017, no pet.); *see*

37

*also Steen*[ *v. State*, No. 13-14-00547-CR], 2016 WL 873010, at *2 [(Tex. App.—Corpus Christi–Edinburg, Feb. 18, 2016, pet. ref'd) (mem. op., not designated for publication)].  Stated differently,

> [t]his court will not overturn a criminal conviction for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly. In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict.  A conviction must be reversed for non-constitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error.  Grave doubt means that in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.  In cases of grave doubt as to harmlessness[,] the petitioner must win.

*Barshaw*[ *v. State*], 342 S.W.3d [91,] 93–94 [(Tex. Crim. App. 2011)] (quotations and citations omitted).

555 S.W.3d at 398.

The court in *Proenza III* then went on to describe what should be examined in making the harm determination:

> We review the entire record to ascertain the effect or influence on the verdict of the error.  [*Barshaw*, 342 S.W.3d] at 93.  We consider "testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire, if applicable." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014) (citing *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003)).  We also consider "the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, and may include whether the State emphasized the error and whether overwhelming evidence of guilt was present." *Id.*; *Barshaw*, 342 S.W.3d at 94.  "While the most significant concern must be the error and its effects, the presence of overwhelming evidence

supporting the finding in question can be a factor in the evaluation of harmless error." *Wesbrook . . .* , 29 S.W.3d [at] 119 . . . ; *Simon*[ *v. State*], 203 S.W.3d [581,] 593 [(Tex. App.—Houston [14th Dist.] 2006, no pet.)]. Neither party has the burden to prove or disprove harm; instead, it is the responsibility of the reviewing court, once it concludes there was error, to determine whether the error affected the judgment. *Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001)[.]

*Id.* at 398–99.

We will not rehash our description of the record that is set forth above. Though we disagree that the trial court's act was inherently prejudicial, we will assume for the purpose of our harm analysis that the trial court's actions conveyed an opinion that Appellant somehow posed a danger to the complainant and also conveyed some opinion of the court about the relationship. We then ask whether that opinion had "a substantial or injurious effect or influence on the jury's verdict" and hold the error was harmful only if we have "grave doubt that the result of the trial was free from the substantial effect of the error." *See id.* at 398. We do not harbor any grave doubts about whether the jury, in reaching its verdict, was influenced by the brief episode at issue. Again, Appellant admitted to all the elements of the offense. He apparently hoped that he could convince one member of the jury that he was guided by a different moral compass and that this juror would nullify the effect of the evidence and vote to acquit. The failure of that strategy leaves us with no grave doubts that the jury reached a verdict based on the absence of any factual controversy that Appellant committed the acts alleged in the indictment and not on what it might have gleaned as the trial court's opinion from the fleeting episode that Appellant claims was error.

39

Accordingly, we hold that the trial court's error was harmless, and we overrule Appellant's second point.

## V. Conclusion

Having overruled Appellant's two points, we affirm the trial court's judgment.[5]

---

[5]On June 2, 2020, Appellant filed a "notice and objection" in which he objected to continued representation by his appointed appellate counsel and sought appointment of new appellate counsel. We construe the notice as a motion to abate for the appointment of new appellate counsel.

Appellant claims that his present appellate counsel failed to carry out Appellant's strategic instructions on what to present at a hearing on a motion for new trial, was not zealously representing Appellant because counsel feared that he would antagonize the trial court and the district attorney, and "has a belief that [Appellant's] conviction should be affirmed." The motion states only Appellant's conclusion about this "belief" and does not state how it was expressed.

More than a year ago, we abated this case when Appellant filed a motion seeking to represent himself pro se on appeal. Immediately before the hearing on the motion for new trial about which Appellant now complains, the trial court conducted a hearing to address our abatement order. At that hearing, Appellant stated that he did not wish to represent himself pro se. The following exchange then occurred between Appellant and the trial court:

> THE COURT: Okay. Now, I initially had appointed an attorney on the appeal, and then I appointed [present appellate counsel] to represent you on appeal. And currently, according to my records, [present appellate counsel] is your court-appointed attorney. Is that [your] understanding?
>
> [APPELLANT]: That is my understanding[.]
>
> THE COURT: And you would wish to proceed with [present appellate counsel] as your attorney?
>
> [APPELLANT]: Yes, ma'am.

In essence, Appellant now claims that he was coerced into accepting counsel's strategic decision on how to present the grounds for a new trial in a hearing that

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 22, 2020

occurred immediately after he stated that he wished to proceed with his present counsel. Appellant's present motion states,

> I've told appeal counsel I was not happy with his representation of my Motion for a New Trial litigation and felt coerced to . . . do things his way or no way at all and did not consent to it. I gave the [benefit] of doubt to counsel to seek substitute counsel, but when it was not done, I voice[d] my objections.

Appellant, however, did not voice any concerns about the presentation of the motion for new trial when he was asked whether he wished to proceed with present counsel immediately before the hearing on the motion for new trial.

Though we should investigate a claim that a lawyer has a conflict of interest, "it is not always necessary for the court to hold a hearing concerning an alleged conflict when a substitution motion does not advance a valid basis for the asserted conflict." *Cooper v. State*, No. 05-18-01246-CR, 2019 WL 6606364, at *3 (Tex. App.—Dallas Dec. 5, 2019, pet. ref'd) (mem. op., not designated for publication). "Generally, conclusory allegations of conflicts of interest, disagreements on trial strategy, and personality conflicts are insufficient to satisfy the defendant's burden." *Id.* Here, Appellant's claims of a conflict are conclusory and are apparently based on an attempt to renege on his prior acquiescence with counsel's strategic decision. Further, "[a] court has no duty to search for counsel who is agreeable to the defendant, and the right to counsel cannot be insisted upon in such a way as to obstruct the orderly administration of justice." *Id.* At the time Appellant filed his present motion, his counsel had already filed Appellant's brief. We do not know whether Appellant's change of heart about his counsel's strategy is sincere or merely an effort to delay, but Appellant's remorse about a strategic decision that he had at least acquiesced in and which he had the opportunity to complain about to the trial court on the very occasion when it was being implemented will not be allowed to delay the disposition of this appeal.

Accordingly, we deny Appellant's motion to abate this appeal for the appointment of new counsel.