

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00144-CR

BRAYLON DOMINIQUE ELLIS

APPELLANT

V.

THE STATE OF TEXAS

STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NO. 1447240R

----------

## OPINION

----------

In three issues, Appellant Braylon Dominique Ellis appeals his conviction for murder. *See* Tex. Penal Code Ann. § 19.02 (West 2011). We affirm.

## Background

On September 7, 2013, Andrea Brown discovered the dead body of her older brother Tommy Brown in his home after she went to check on him out of concern that no one had heard from or seen him for days. An investigation

revealed that Tommy had been the victim of a love triangle with Appellant and Christina Rodriguez, whom Tommy had met as a pen pal while she was serving time in a penitentiary. Tommy reportedly also had a long-time romantic relationship with a woman named Connie Moreno, who did not appear to be involved in his death in any way. From the record, it does not appear that either Moreno or Rodriguez was living with Tommy at the time of the murder.

In the days following his death, the Fort Worth Police Department (FWPD) tracked Tommy's cell phone and debit card to a location outside of Atlanta, Georgia, where Appellant and Rodriguez were apprehended. Although charged with capital murder, Appellant was convicted of the lesser-included offense of felony murder and sentenced to life in prison for his part in Tommy's death. *Compare id.* § 19.03 (West Supp. 2016) (providing elements of capital murder), *with id.* § 19.02 (providing elements of felony murder).

## I. The day of the murder

In the afternoon or early evening of September 5, Willie Wingfield, Tommy's neighbor, saw a "white girl [who was] more heavy-set and just a little bit shorter than Tommy" go into Tommy's house while Tommy was home. Willie testified that the woman was not Moreno, a Hispanic woman whom he described as "short with long black hair" and Andrea described Moreno as approximately 5'1" to 5'2" and of average weight. Instead, Willie's general description of the woman he had observed more closely fit the description of Rodriguez at trial, as a woman who was "tall and heavyset."

2

Later that evening, between 9:30 and 10:00, Willie also saw a dark-skinned young man with braided hair go into Tommy's house. According to Willie, Tommy was not at home at that time. Later, Willie watched as Tommy pulled his pickup into his driveway, emerged from the pickup, and walked to his front door. Willie testified that as Tommy attempted to unlock his front door, the front door opened, someone "snatched" Tommy and pulled him into the house, and then the lights went off. Willie did not call the police at that point.

The next morning, when Willie went outside to water his yard and drink coffee—his usual morning routine—he noticed that Tommy was not partaking in his usual morning routine of sitting on his porch, smoking a cigarette, and drinking a coffee between 6:45 and 7:00. Willie also noticed that Tommy's pickup was no longer in his driveway, so he assumed that Tommy had gone to work early.

## II. Discovery of the body and the ensuing investigation

Andrea, who had last seen Tommy alive on September 2 or 3, received a call from her aunt on the morning of September 7. Andrea's aunt, who lived across the street from Tommy, called Andrea at work to express her concern that she had been unable to reach Tommy for a couple of days. Andrea assured her aunt that she would call him.

At 9:26 that morning, Andrea texted Tommy, "Call me ASAP," but she received no response, which, according to Andrea, was unusual for Tommy. Andrea grew increasingly worried as the day went on, and more so when her

3

aunt told her that Tommy's car was not at his house. At approximately 3:00 that afternoon, Andrea drove to Tommy's home and, using a key she found in his mailbox, Andrea went inside. Andrea testified that she immediately noticed that some of his property, including his plasma TV, was missing, and when she continued through the home she discovered Tommy's body lying on the bathroom floor. His hands were tied behind his back and his "fingers had started turning colors." Although she called out to him several times, Andrea testified that she knew what was wrong, she knew it was "a crime scene," and so she immediately left the house and called 9-1-1.

FWPD Detective Thomas O'Brien responded to the call. While he was interviewing Andrea, she received a text message from Tommy's phone that said, "I[']m driving to El Paso what u want?" Detective O'Brien asked Andrea to respond to the text message she had received because the police could use the cell phone information to track the murderer(s) and to collect more information. On Detective O'Brien's direction, Andrea texted back, "[O]k call me when u get back. Have a safe trip," but she did not reveal that Tommy's dead body had been found.

Andrea was not the only person who received text messages from Tommy's phone after his body was discovered. On September 7, after becoming concerned when Tommy uncharacteristically missed a janitorial job, his coworker, Deborah Grimes, tried to reach him by phone. She received a text back from "him" two days later, on September 9, that said:

4

Debra I wont b back no time soon I don't know if u remember I told you I was gonna b a father well my girl is in the hospital and im low in cash is there anyway I can borrow some cash I lost my wallet im in the middle of the road if you can send money to my causin his name is Braylon Ellis, do it Money gram please just deduct it from my check?

The next day, Grimes received two more text messages from Tommy's phone claiming that he could not call because his phone was broken and asking, "How soon can u send it to my causin do it Money Gram please."

Cell phone records and records for Tommy's debit card indicated that both were taken from Fort Worth to an area outside of Atlanta, Georgia. From surveillance videos, Detective O'Brien identified Appellant and Rodriguez as the individuals using the debit card at various places, including to pay for a prescription in Appellant's name at Texas Health Presbyterian in Dallas.

Appellant and Rodriguez were located and arrested on September 10 at Appellant's mother's house in Gwinnett County, Georgia. Tommy's cell phone and driver's license were found in the room where Appellant and Rodriguez were staying, and Tommy's debit card was found inside the vehicle—later identified as the vehicle Appellant and Rodriguez drove to Georgia—parked outside the house.

Detective O'Brien interviewed Appellant, and a video of the interview was admitted into evidence and played for the jury. In it, Appellant changed his story multiple times. At first, he claimed he did not know Tommy, but later he claimed that Tommy had beaten Rodriguez and that Tommy was a molester. He also

5

initially claimed that he had never been to Fort Worth, but then added he had been to Fort Worth as a child, and then finally admitted to Detective O'Brien that he had picked up Rodriguez in Fort Worth and had stayed at a hotel near Tommy's house on the night Tommy was murdered. Although Appellant denied that he had been to Tommy's house, blood samples collected at the scene matched both Appellant's DNA profile and Rodriguez's DNA profile.

## III. The trial

Additional testimony at trial revealed that Tommy died of asphyxia—he was discovered with two plastic bags tied around his head with a shoelace—blunt-force injuries to the head or neck, or a combination of both. Appellant also took the stand in his own defense.

Appellant testified that he fell in love with Rodriguez in early 2013 after meeting her while riding on a bus headed to California. By March 2013, he moved to El Paso to live with her, even though he did not know her age or that she had served time in the penitentiary. In August 2013, they decided to move to Georgia, where his mother lived.

On their way to Georgia, Appellant and Rodriguez developed a plan to stop at Tommy's house in Fort Worth to steal from him. By that point, Appellant was aware that Rodriguez had been in a relationship with Tommy and had previously stolen Tommy's wallet and credit cards several times. As part of the plan to steal from Tommy, Appellant testified that he planned to "beat him" and

6

"kick his ass" because he believed that Tommy had beaten Rodriguez and had tried to kill her once. Appellant testified he did not intend to kill Tommy.

Appellant admitted that, on the night of September 5, he waited in Tommy's house for Tommy to come home. But when Appellant heard Tommy's car pull up and heard Tommy come in the house with Rodriguez, he "got scared" and ran into the bathroom. When he heard Tommy coming down the hallway, Appellant picked up the lid to the toilet tank and hit Tommy on the head with it. According to Appellant, the lid broke on impact with Tommy's head and cut Appellant's hand, leaving Appellant's blood in the bathroom and hallway areas. Tommy and Appellant then began to fight in the hallway outside the bathroom during which time Appellant estimated that he hit Tommy eight to ten times with his fists in an attempt to knock him out. Appellant testified that, while he was punching him, Tommy was making noises that sounded like he was in pain. Appellant testified that he initially "knock[ed] him out," but as Tommy began to "wak[e] back up," Rodriguez handed Appellant a kitchen pot with instructions to "use this to knock him out." After hitting Tommy with the pot "one, two, maybe three" times—until Tommy was unconscious—Appellant bound Tommy's hands behind his back with a shoelace. Even after that, according to Appellant, Tommy woke up again and—in "trying to get away"—managed to move himself from the hallway where he had been tied up and into the bathroom. According to Appellant, he cleaned himself up, put a makeshift bandage on his wound, left Tommy's house shortly thereafter and walked to his car, which was parked

7

around the corner. On his way out of the house, Appellant took Tommy's television and loaded it into Tommy's pickup. Rodriguez then drove the pickup to a nearby convenience store, where she met Appellant. According to Appellant, Rodriguez then moved Tommy's television and two bags—containing, among other items, Tommy's wallet, credit cards, and cell phone—from the pickup into Appellant's car, and the two then abandoned Tommy's pickup in the parking lot where it was later found by FWPD.

Appellant and Rodriguez later went to Texas Health Presbyterian hospital in Dallas to seek treatment for Appellant's hand. After using Tommy's debit card to pay for Appellant's prescription, the pair headed to Georgia. Appellant testified that it was Rodriguez who sent the text messages to Andrea and Grimes on their way to Georgia and that he was not aware that she was sending the text messages at the time. He did, however, admit that he had knowingly used Tommy's debit card on their way to Georgia.

At trial, Appellant denied tying any plastic bags over Tommy's head or wrapping tape or a shoelace around Tommy's neck. He denied any intent to kill Tommy or take his property, although he admitted that he knew Rodriguez planned to steal from Tommy. Appellant's only intent, he claimed, was to "kick his ass."

**Discussion**

In his first issue, Appellant argues that the trial court erred by denying his motion to suppress the recorded statement made to Detective O'Brien because

8

Appellant did not clearly and unequivocally waive his rights. Appellant's second and third issues argue that the trial court erred by overruling his objections to the admission of reproduced cell phone text messages.

## I. Motion to Suppress

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

Detective O'Brien interviewed Appellant on September 11, 2013. A video recording of the interview was admitted into evidence. Detective O'Brien read Appellant his *Miranda*[1] rights and then asked Appellant if he knew how to read, to which Appellant responded, "Yes." Detective O'Brien then asked Appellant to read the following portion of the waiver form, which he did: "I have read and

---

[1]*See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). The Texas Code of Criminal Procedure expressly delineates the requirements of *Miranda* by requiring officers to inform people of their rights prior to custodial interrogation in order for resulting statements to be admissible. Tex. Code. Crim. Proc. Ann. art. 38.22 § 3 (West Supp. 2016).

9

understand my legal rights as stated above on this document. I freely, voluntarily, and knowingly waive these legal rights and agree to be interviewed by police." Appellant then signed the waiver form.

At trial, Appellant's counsel moved to suppress the video, arguing that the above did not constitute a valid waiver in accordance with article 38.22 because Detective O'Brien did not specifically ask Appellant if he waived his rights. *See* Tex. Code Crim. Proc. Ann. art. 38.22. The trial court denied the motion and subsequently entered written findings of fact that Detective O'Brien advised the defendant of his rights, that the defendant read aloud the waiver portion of the written warnings, and that the defendant signed that he understood his rights and that he was freely and voluntarily waiving them.

Appellant has provided us with no support for his argument that Detective O'Brien was required to verbally ask if Appellant waived his rights.[2] Under the facts here, we decline to read such a requirement into the rule and, having reviewed the video recording and Detective O'Brien's testimony, find that these support the trial court's fact findings. *See Leza v. State*, 351 S.W.3d 344, 353 (Tex. Crim. App. 2011) ("[W]e have consistently held that waiver of Article 38.22 rights 'may be inferred from actions and words of the person interrogated.'");

---

[2]We note that it is the party's responsibility to fully brief an argument and to provide legal authority to support its position. *See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 2712 (2012).

*Bleil v. State*, 496 S.W.3d 194, 208–09 (Tex. App.—Fort Worth 2016, pet. ref'd).

We therefore overrule Appellant's first issue.

## II. Admission of text messages

Appellant's second issue argues that the admission of the reproduced text messages violated the prohibition against hearsay. His third issue argues that their admission violated the best evidence rule.

We review a trial court's decision to admit evidence for abuse of discretion. *Mai v. State*, 189 S.W.3d 316, 320 (Tex. App.—Fort Worth 2006, pet. ref'd). If the court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Id.*

FWPD Sergeant Troy Lawrence testified that he analyzed Tommy's cell phone and had attempted to download the text messages stored on the phone, but he was not able to do so because it was a "throwaway" or "burner" phone and the USB port on that sort of phone cannot be used for downloading data from the phone. Sergeant Lawrence described that, in situations when they are not able to directly download data from a phone, the FWPD transcribes the texts and call logs by manually typing them into an Excel spreadsheet. According to Sergeant Lawrence, he followed this procedure in this case, and after the texts were transcribed, another examiner in the lab peer reviewed his work to verify its accuracy. At trial he identified the resulting exhibits, State's Exhibit 140 and 141, as true and accurate depictions of text conversations between Andrea's phone

and Tommy's phone and between Grimes's phone and Tommy's phone, as observed on Tommy's phone after it was recovered.

Exhibit 140 replicated the following texts between Andrea's and Tommy's phones:

[Andrea:] call me ASAP [Date stamp 9/7/2013]

[Tommy's phone:] Im driving to El Paso what u want? [Date stamp 9/7/2013]

[Andrea:] ok call me when u get back. Have a safe trip.

Exhibit 141 replicated texts between Grimes's and Tommy's phones:

[Grimes:] Call me [Date stamp 9/7/13]

[Tommy's phone:] Im driving to El Paso had a emergency [Date stamp 9/7/13]

[Grimes:] Your buildings are covered for the weekend. Call me as soon as you get back.

[Tommy's phone:] Thank you. So much ..

[Grimes:] Is the back pack at the kennel? [Date stamp 9/7/13]

[Tommy's phone:] Debra I wont b back no time soon I don't know if u remember I told you I was gonna b a father well my girl is in the hospital and im low in cash is there anyway I can borrow some cash I lost my wallet im in the middle of the road if you can send money to my causin his name is Braylon Ellis, do it Money gram please just deduct it from my check? [Date stamp 9/9/13]

[Grimes:] I am very worried about you. I have your check from last month do you rill need [Date stamp 9/10/13]

[Grimes:] Do you still need me to send your money to Braylon Ellis. Please let me know. I hope your girl and baby are okay.

[Tommy's phone:]  Yes don't b worried im fine as soon as my girl gets release im taking her and the baby back with me.  I just dropp my phone its cracked I can't call li can only tex

[Tommy's phone:] How soon can u send it to my causin do it Money gram please. [Date stamp 9/10/13]

Appellant's counsel objected to the admission of Exhibits 140 and 141, arguing that the text messages constituted hearsay and that their admission would violate the best evidence rule.  The trial court initially sustained Appellant's objections but later overruled the objections after Detective O'Brien testified that the phone was recovered from the house in Georgia where Appellant and Rodriguez had been staying.

## A.  Hearsay objection

In response to Appellant's hearsay objection at trial, the State argued alternatively that (1) the text messages were not hearsay because they were not being offered for the truth of the matter asserted, *see* Tex. R. Evid. 801(d)(2), and (2) if the text messages were hearsay, they were admissible under the party-opponent exception, *see* Tex. R. Evid. 801(e)(2).  At trial and in his brief to this court, Appellant has only responded to the State's argument that the text messages are admissible statements of a party-opponent or coconspirator.  And, although the State has not reurged this argument on appeal, we agree with its position at trial that the text messages between Tommy's phone and Andrea's and Grimes's phones were not hearsay because they were not offered for the truth of the matter asserted.  *See Martinez v. State*, 91 S.W.3d 331, 336 (Tex.

Crim. App. 2002) ("appellate courts may uphold a trial court's ruling on any legal theory or basis applicable to the case").

Texas Rule of Evidence 802 provides that hearsay is generally inadmissible, but for a document or statement to meet the definition of hearsay, it must be offered to prove the truth of the matter asserted therein. Tex. Rule Evid. 801(d)(2) (defining hearsay as an out-of-court statement offered "to prove the truth of the matter asserted in the statement"). *But see* Tex. R. Evid. 802, 803, 804 (characterizing certain out-of-court statements as nonhearsay and providing exceptions to the hearsay rule). Here, the relevance of the text message conversations was not in any way dependent upon the truth of the messages themselves. In fact, on this record, it could hardly be disputed "Tommy's" messages to Andrea and to Grimes were manifestly false. Instead, the relevancy hinged on the text messages being purportedly sent by Tommy from his phone after Tommy's dead body had already been discovered, combined with the discovery of Tommy's phone in Appellant's and Rodriguez's possession after they were apprehended in Georgia. *See Huff v. State*, 560 S.W.2d 652, 653 (Tex. Crim. App. [Panel Op.] 1978) (holding that evidence of defendant's license plate number written on back of forged check was not hearsay because it was offered to describe relevant details of transaction surrounding forged check); *Utsey v. State*, 921 S.W.2d 451, 455 (Tex. App.—Texarkana 1996, pet. ref'd) (holding bus tickets were not hearsay when offered "to show the circumstantial relationship of the parties to the scene, the contraband, or other parties," not to

14

show the truth of the matter asserted on the tickets themselves); *see also Norton v. State*, 564 S.W.2d 714, 717 (Tex. Crim. App. [Panel Op.] 1978) (holding evidence of telephone conversations between appellant and police in prosecution for making a false report were not hearsay because they were evidence of operative facts of whether communications were made and not their truth or falsity).

We hold the trial court did not abuse its discretion by admitting the text message conversations over Appellant's hearsay objection.

### B. Best evidence rule

Appellant also argues that the text message conversations were inadmissible under the best evidence rule. The best evidence rule provides that an original writing, recording, or photograph is required to prove its content. Tex. R. Evid. 1002. For electronically stored information, rule of evidence 1001(d) defines an "original" as "any printout—or other output readable by sight—if it accurately reflects the information." Tex. R. Evid. 1001(d); *cf. Burleson v. State*, 802 S.W.2d 429, 441 (Tex. App.—Fort Worth 1991, pet. ref'd) (holding that a computer-generated "display," on which a witness relied, qualified as an original under the best evidence rule because it was an "output other than a print-out" that was readable by sight, even though a hard copy of the display was not admitted into evidence). When a "print-out" or "other output" is not obtainable, rule of evidence 1004(b) allows the content of the original to be proven through "other evidence" of its content. Tex. R. Evid. 1004(b) (providing that an original is

15

not required if it "cannot be obtained by any available judicial process); *see also United States v. Jackson*, 488 F. Supp. 2d 866, 871 (D. Neb. 2007) (holding cut-and-paste document of text messages were inadmissible under federal rule 1004 because evidence showed the text message conversation had been altered and was inaccurate).

Sergeant Lawrence testified that the USB port on Tommy's phone would not allow him to directly download the text messages it stored. So, Sergeant Lawrence retrieved the content of the electronically stored messages by transcribing the texts and call logs—by manually typing them into an Excel spreadsheet. This information, in turn, was formatted into a "bubble" form commonly used to represent text messages. The resulting document was then peer reviewed to ensure its accuracy. Sergeant Lawrence testified that the resulting exhibits were true and accurate depictions of text message conversations as stored on Tommy's phone.

Even assuming, without holding, that the process Sergeant Lawrence employed to generate exhibits 140 and 141 did not meet the rule 1001(d) definition of "original"—as a "printout" or "other output"—Sergeant Lawrence's testimony nevertheless supports the admission of the text message conversations as "other evidence" when the original cannot be obtained. *See* Tex. R. Evid. 1004. At that point, any challenge by Appellant would go "not . . . to admissibility but to the weight to be given the evidence, with final determination

left to the trier of fact." *United States v. Gerhart*, 538 F.2d 807, 809 (8th Cir. 1976) (discussing the federal equivalent of Texas rule of evidence 1004).

Thus, the trial court did not abuse its discretion by overruling Appellant's objection on this basis. *See Ortiz v. State*, 651 S.W.2d 764, 766 (Tex. Crim. App. 1983) (noting the purpose of the best evidence rule is to secure production of the "best *obtainable* evidence of its contents, if the document cannot as a practical matter be produced"); *Howell v. Howell*, No. 13-10-00687-CV, 2013 WL 784542, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, no pet.) (mem. op., not designated for publication) (holding trial court did not err by allowing witness to read text message aloud after counsel represented that a document of the text message was not obtainable).

We hold the trial court did not err by admitting the text message conversations based on the best evidence rule.

### C. Any error in admitting the text messages was harmless

Even if the trial court erred by admitting the text message conversations, Appellant was not harmed by their admission. Any error in the trial court's admission of the text messages is nonconstitutional, *see Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001), so we apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights, Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

17

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

In this case, perhaps most significantly, the jury had the benefit of Appellant's own testimony. In his testimony, Appellant admitted that he and Rodriguez went to Tommy's house, that Appellant laid in wait for Tommy to come home with the intention of "kicking his ass," that Appellant struck Tommy's head with a ceramic toilet tank lid so hard that it broke on impact, that Appellant repeatedly punched Tommy until he passed out at least once, that Appellant hit Tommy up to three times with a kitchen pot, and that Appellant tied Tommy's

18

hands behind his back so that he could not escape.  Although Appellant denied strangling Tommy or tying the plastic bags around his head, the medical examiner testified that Tommy could have died from blunt-force trauma alone.

Considering this evidence, in addition to the evidence that Appellant's blood was found at the scene and that he was in possession of and had used Appellant's debit card on his journey to Georgia, we cannot say that any erroneous admission of the text message exhibits had a substantial or injurious effect on the jury's verdict.  *See Black v. State*, 358 S.W.3d 823, 833 (Tex. App.—Fort Worth 2012, pet. ref'd) (erroneous admission of hearsay text messages did not have a substantial or injurious effect in light of other evidence of Appellant's guilt).  We overrule Appellant's second and third issues.

## Conclusion

Having overruled each of Appellant's issues, we affirm the judgment of the trial court.


/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and SUDDERTH, JJ.

PUBLISH

DELIVERED:  April 20, 2017

19