

# NUMBERS 13-24-00109-CR, 13-24-00110-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

| | |
|---|---|
| **ANTHONY DESHAWNTI PERRY,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

## ON APPEAL FROM THE 23RD DISTRICT COURT
## OF MATAGORDA COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Silva, Peña, and Cron**
**Memorandum Opinion by Justice Cron**

A jury convicted appellant Anthony Deshawnti Perry of aggravated assault with a deadly weapon and unlawful possession of a firearm by a felon, and he was sentenced to life imprisonment on each offense. *See* TEX. PENAL CODE ANN. §§ 22.02(a)(2), 46.04(a).

By what we construe as two issues, appellant argues that (1) his trial counsel was ineffective; and (2) the trial court reversibly erred by admitting unauthenticated hearsay evidence over appellant's objection. We affirm.

## I.     BACKGROUND

### A.     Pre-Trial

On January 25, 2021, appellant was indicted for aggravated assault with a deadly weapon in trial court cause number 21-023-013, and unlawful possession of a firearm by a felon in trial court cause number 21-023-014.

In pertinent part, the indictment in trial court cause number 21-023-013 alleged that appellant "on or about the 25th day of October 2020, did then and there intentionally or knowingly threaten [O.B.][1] with imminent bodily injury and did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault." Additionally, in pertinent part, the indictment in trial court cause number in 21-023-014, alleged that appellant:

> on or about the 25th day of October, 2020, did then and there, having been convicted of the felony offense of Assault Family Violence with Priors on the 26th day of March 2020, in cause number 86691-CR in the 239th District Court of Brazoria County, Texas intentionally or knowingly possess a firearm before the fifth anniversary of the defendant[']s release from supervision under parole following conviction of said felony[.]

On January 9, 2024, less than a month away from trial, appellant was appointed his fourth trial counsel.

---

[1] To protect the identity of the complainant we refer to by her initials. *See* TEX. CONST. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

**B. Trial[2]**

A jury was impaneled on the first day of trial, February 5, 2024, and the following jurors were seated: numbers 17, 23, 27, 29, 30, 32, 33, 34, 35, 36, 37, 38, and 51, as an alternate. Trial proceeded over the next to two days, February 6, 2024, and February 7, 2024, and the State presented six witnesses during the guilt-innocence phase. These witnesses testified about the incident and events that took place before and after the incident.

**1. The Incident**

After a disagreement the night before with appellant over his communication with other women, O.B., appellant's ex-wife, testified that on October 25, 2020, she got up in the morning and left to watch a football game at her cousin's house. She explained that she no longer wanted to argue with appellant and wanted him to leave her house. O.B. testified that she had invited appellant to stay over at her home because he claimed he had nowhere else to go. She admitted she still loved him.

While at her cousin's house, O.B. turned her phone off because appellant was continuously texting her. When she turned her phone back on, she discovered that she had several messages from appellant. After a lot of back and forth ensued, she suggested that they go to the beach to "talk about this." She explained that going to the beach used to be their "thing on Sundays." O.B. testified that she saw appellant leaving as she arrived home but he turned around, parked, and immediately grabbed her keys and her phone. She testified that out of habit and despite being scared, she got in her car and appellant began driving to the beach.

---

[2] The background was derived from the testimony and evidence adduced at trial.

As they were driving, O.B. testified that appellant is "arguing he's basically tired of me putting the laws in his life. We were just talking about stuff. It was like no big deal. Let's talk about it. I am trying to calm him down. He's going back to the times he's been in prison with me. He's sick at that." Unsure of how they got to this point, O.B. stated that he "did pull a gun out." O.B. testified that appellant "was just in this rage and I am just steady calm down, and you know, at this time like I said, I saw this gun and he threatened." She further testified that, after drawing the gun, he initially threatened to "kill" her. After O.B. questioned him, appellant said, "I won't kill you[,] but I will pistol whip you." Although O.B. explained the events that day she was unable to reenact what appellant did with the gun.

O.B. explained that at one point she told appellant to stop so she could use the restroom, and when he stopped on the side of the road she turned on another phone that she kept in her purse. Back in the car, O.B. testified that after thinking "I want to get away from this man," she asked appellant to stop at a grocery store so she could use the restroom again and they could purchase some beer. From inside a restroom stall, she called the Bay City Police Department (BCPD), informing the operator where she was and what kind of car she was in.[3] She explained that she did not remain in the stall because "this was a routine thing," and otherwise "he probably would have c[o]me in." After seeing police vehicles on the way to self-checkout, O.B. explained appellant exited the store, but a BCPD officer located him shortly thereafter.

Emma Byrd, former BCPD dispatcher and 911 operator, received the call from O.B. and dispatched BCPD officers to the location. Upon arrival, BCPD Officer Ruben

---

[3] A recording of the call was admitted into evidence.

4

Gutierrez testified that he drove around the parking lot because details were unclear, but O.B. then waived him down. After obtaining a brief synopsis from her about what happened, including learning that a weapon was involved and appellant's description, Officer Gutierrez observed appellant walking towards the entrance of the store. Officer Gutierrez observed appellant speeding up to "run into HEB" after making eye contact with him. He testified that he located appellant in the grocery store walking down an aisle and detained him. According to Officer Gutierrez, they exited the store and briefly met with two other responding officers, at which time appellant explained after being asked by one of the officers, Dan Shook, a former BCPD sergeant, whether he was allowed to have a firearm and why he had one, that he was returning it to a person that let him borrow it.[4] A short time later Officer Gutierrez transported appellant to jail.

Former Sergeant Shook testified that, when appellant was detained outside the grocery store after being asked, appellant told him that the firearm was in his wife's car, that he was a felon, and that he was "taking it back to a friend." Appellant also told Sergeant Shook that "he borrowed it the day before and was taking it back to the friend that day." Sergeant Shook stated that he retrieved the gun from the vehicle, and it was "tucked right between the driver's seat and console" of the vehicle. He testified that the gun was fully loaded but no bullet in the chamber. Sergeant Shook denied wiping the gun down and explained that it seemed to be in good condition.

BCPD Senior Crime Investigator Donna Pruitt testified that she did not find prints on the gun or the bullets. She explained that she was able to locate the registered owner

---

[4] A recording taken from Officer Gutierrez's body worn camera was admitted into evidence which depicted some of appellant's interaction with the other on-scene officers outside of the grocery store. The video shows Officer Gutierrez stepping away at one point to retrieve his police vehicle.

of the gun by its serial number, and the owner had previously reported to law enforcement that some guns were stolen from her residence without providing serial numbers. When officers ran the gun, it did not come back as stolen.

### 2. Prior to the Incident

During O.B.'s testimony the State asked her whether appellant was convicted in March of 2020 of assault family violence with a previous conviction, and O.B. replied, "Yes, ma'am." O.B., also replied, "Yes, ma'am," when asked whether she was the victim of that offense. Further, she replied "Yes, ma'am" when asked whether appellant was on parole for the March of 2020 offense when he came to her home.[5]

### 3. Post-Incident

After appellant's arrest, O.B. testified that she visited Shawanna Goodwin, a former employee of hers, at Goodwin's house. They were discussing the incident and there was another man there that knew appellant had been arrested. O.B. said, "They call him little ugly[,]" and he refers to appellant as "P-dog." O.B. explained that "little ugly" stated, "man P Dog got arrested. He was supposed to have did something with his wife and then proceeded on talking about the one night that [appellant] picked him up and wanted him to ride with him to Sweeny to go kill his wife." According to O.B., Goodwin then asked "little ugly" if he knew who O.B. was and he replied "no." O.B. then said "[W]ell I'm the wife that he wanted to kill[.]"

---

[5] After the testimony, the State then moved to admit a Declaration of Sarah H. Wright who said therein, among other things, that she is "the custodian of records for the Classification and Records, a part of the Texas Department of Criminal Justice (TDCJ) located in Huntsville, Texas. Attached are true and correct copies of information provided on Perry, Anthony[,]" a brief letter dated February 2, 2024, and a Judgment of Conviction by Court – Waiver of Jury Trial." These documents were admitted, without objection, as State's Exhibit No. 12.

Gary Will Nixon testified that he knew appellant[6] by the name of "P Dog" and that folks that know him call him "little ugly." He then denied knowing Goodwin, could not recall that appellant had been arrested, denied that P-dog ever asked him to go on a ride with him, denied that appellant ever asked him to go to Sweeny, and denied that he ever told anybody that appellant asked him to go to Sweeny. The State later recalled Nixon, who indicated that he had been "spooked" during his previous testimony because of the seriousness of the alleged offense. He then explained "[T]here was a time [appellant] said that he wanted to ride to Sweeny with him[,]" and when he got in the vehicle, appellant "showed [him] a gun." Nixon clarified that appellant showed him a handgun, and he said that appellant then stated, "I am going to go do something to my ex-wife" and asked, "You want to ride with me[?]" Nixon further explained that appellant said, "I hate to do this man. But I think she need—get—tell her—get off my back." He also explained that appellant clarified, "I am just thinking about it." He also explained it is possible that O.B. was there when he was there telling this story to a woman he calls "Wanny", but he was unsure because he did not know who O.B. was at the time. Nixon confirmed that it is "pretty common for people to say I am going to kill that mother[*]ucker and they don't mean it[.]" Nixon did not believe that appellant was being serious.

According to O.B., appellant signed his property that he had at the jail (a wallet, a phone, and possibly some jewelry) over to Goodwin, and Goodwin gave it to O.B. because appellant wanted O.B. to come get his stuff. O.B. went through the phone and observed several text messages that she photographed with her phone and then provided

---

[6] Initially, the record shows his identification was made through a description of clothing but on recall, Nixon confirmed that P Dog is appellant.

7

to the State.[7] O.B. testified that appellant pressured her along with other family members to drop the charges, and she eventually signed an affidavit of non-prosecution. But she explained that she met with the State's investigator at the time she signed the affidavit and indicated to the investigator that she was still willing to be truthful and would testify if called to do so.

### 4. Verdict

The jury found appellant guilty in both causes and a punishment hearing was held. The State presented two witnesses: O.B and Senior Crime Investigator Pruitt. Appellant's trial counsel briefly cross-examined O.B. but presented no other evidence. The jury subsequently sentenced appellant on both causes to life in prison.

Appellant filed a motion for new trial, and an ineffective assistance claim was raised in the motion, but no hearing was held. This appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.02; TEX. R. APP. P. 25.2(a)(2).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

We understand appellant to assert ineffective assistance of counsel because his trial counsel failed to (1) properly conduct voir dire, (2) object to extraneous offense evidence, and (3) provide any mitigation evidence at sentencing. He asserts that each ground alone demonstrates that his trial counsel was ineffective. Alternatively, he claims these collective errors rendered trial counsel's representation ineffective.

### A. Standard of Review & Applicable Law

The United States Constitution and the Texas Constitution guarantee individuals the right to assistance of counsel in a criminal prosecution. U.S. CONST. amend. VI; TEX.

---

[7] The photographs were admitted into evidence.

8

CONST. art. 1, § 10. We review ineffective assistance claims under the well-established standard in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, appellant must prove by a preponderance of the evidence that (1) counsel's performance was deficient, meaning it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Id.* at 687; *Ex parte Covarrubias*, 665 S.W.3d 605, 609 (Tex. Crim. App. 2023); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). "In other words [with respect to the second prong], appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Thompson*, 9 S.W.3d at 812. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ex parte Saenz*, 491 S.W.3d 819, 826 (Tex. Crim. App. 2016). "Failure to succeed on either prong is fatal to the ineffectiveness claim." *Ex parte Lane*, 670 S.W.3d 662, 671 (Tex. Crim. App. 2023) (citation omitted). An appellant has the burden to prove ineffective assistance of counsel claims by a preponderance of the evidence, and we review counsel's performance by the totality of the representation, not by isolated acts or omissions. *See Thompson*, 9 S.W.3d at 813; *see also Castellano v. State*, No. 13-23-00094-CR, 2024 WL 379534, at *2 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2024, pet. ref'd) (mem. op., not designated for publication). "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 813. When trial counsel has not been given an opportunity to address the allegations of ineffective assistance and explain their trial strategy, we must presume that trial court's performance was adequate unless the challenged conduct was "so outrageous that no competent attorney would have engaged

in it." *State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

When the deficient performance pertains to punishment, prejudice "would depend on a reasonable probability that the sentencer would have assessed a more lenient punishment absent the errors." *Swinney v. State*, 663 S.W.3d 87, 90 (Tex. Crim. App. 2022). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel's performance constitutes "sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted). That is, judicial scrutiny of counsel's conduct is highly deferential. *Ex parte Saenz*, 491 S.W.3d at 826. "In assessing an attorney's performance, every effort must be made to eliminate the distorting effects of hindsight." *Ex parte Covarrubias*, 665 S.W.3d at 610. A direct appeal is usually an inadequate vehicle for raising an ineffective-assistance-of-counsel claim because the record is generally undeveloped. *See Goodspeed*, 187 S.W.3d at 392; *see also Castillo v. State*, No. 01-23-00334-CR, 2025 WL 793292, at *3 (Tex. App.—Houston [1st Dist.] Mar. 13, 2025, no pet.) (mem. op., not designated for publication) ("Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance." (citation omitted)). Trial counsel should ordinarily be afforded an opportunity to explain his conduct before being denounced as ineffective. *Hart v. State*, 667 S.W.3d 774, 782 (Tex. Crim. App. 2023). A defendant is not entitled to "errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

**B.      Analysis**

**1.      Failure to Properly Conduct Voir Dire**

By his first sub-issue and with reliance on *Montez v. State*, appellant argues his trial counsel failed to examine any of the jurors who indicated they knew law enforcement agents who participated in the investigation of the case. 824 S.W.2d 308 (Tex. App.—San Antonio 1992, no pet.). Appellant argues that venirepersons 30 and 34, sat on the petit jury without being challenged or struck by trial counsel, "even though the record does not record [trial] counsel using *any* of his preemptory strikes."

First, we address appellant's broader complaint that his trial counsel "failed to examine any jurors who had previously answered the State's questions about whether they knew law enforcement agents who actively participated in investigating the case." Our review of the record revels that, apart from venirepersons 30 and 34, venirepersons 10, 26, 28, and 44 did indicate some relationship with one or more of the named law enforcement officials but none of them sat on the jury, which consisted of juror numbers 17, 23, 27, 29, 30, 32, 33, 34, 35, 36, 37, 38, and 51 as an alternate. *See Jackson v. State*, 877 S.W.2d 768, 772 (Tex. Crim. App. 1994) (concluding that appellant failed to meet his burden of showing that his trial counsel's assistance was ineffective after reasoning, among other things, that "the actions of appellant's trial counsel regarding venire members, Hartsfield and Deltoro are not material to our determination of whether appellant's trial counsel was ineffective, since neither were seated on the jury"). And we observe that venireperson 39 indicated knowing them by name only, but stated, "I have no relationship with them." Again, though, venireperson 39 was not seated on the jury. *See id.* Thus, even if we were to presume appellant's trial counsel acted deficiently in this

11

instance, appellant has not demonstrated that he was prejudiced by counsel's action. *See Strickland*, 466 U.S. at 687.

Next, with respect to appellant's complaints regarding trial counsel's failure to examine venirepersons 30 and 34, we conclude that appellant has failed to meet the first *Strickland* prong. *See id.* The following pertinent exchange occurred:

| [State]: | Okay. Thank you, number 47. Thank you. [O.B.'s] son is [D.B.]. Does anybody know [D.B.]? And I am going to call out a few law enforcement officials. Emma Byrd, she was a dispatcher at Bay City Police Department[,] Darrel Brillo is in charge of the jail and Mike Classky he used to be and Donna Pruitt and Vickie they are in charge of ID and evidence. Dan Shook is with the Bay City Police Department. Jermey Washington and Ruben Gutierrez, does anybody know any of those officers or have a relationship with them you wouldn't be able to set aside? Juror what's your number? |
| | . . . . |
| | Okay. Thank you and 30? Based on your relationship with any of those people[, is] that a relationship you can set aside? |
| [Venireperson]: | Yes. |
| | . . . . |
| [State]: | Thank you. 34? |
| [Venireperson]: | Yes. Darrel. |
| [State]: | And based on your relationship is that a relationship you can set aside? |
| [Venireperson]: | Yes. |

As shown above, as compared to *Montez*, the record here does not affirmatively show venireperson 30 had a relationship with one or more of the named "law enforcement officials". *Cf.* 824 S.W.2d at 310 ("The record reflects that prospective juror Batschelet

12

admitted knowing the State's chemist, Jeffrey Todd. Despite this admission, counsel never inquired about the relationship between the witness and the venire person; Mr. Batschelet later served on the jury."). Instead, since the State asked the prospective jurors about law enforcement officials and D.B. at the same time, it is unclear who venireperson had a relationship with. Additionally, the record is silent as to why trial counsel failed to clarify or follow up any further with venireperson 30 or use one of his preemptory strikes on this juror, thus, appellant has failed to overcome the strong presumption that his trial counsel's decision was anything but a strategic one. *See Strickland*, 466 U.S. at 687; *see also Goodspeed*, 187 S.W.3d at 392 (concluding no deficient performance on silent record when counsel did not ask any questions during voir dire); *Rodriguez v. State*, No. 04-17-00336-CR, 2018 WL 3635161, at *5–6 (Tex. App.—San Antonio Aug. 1, 2018, no pet.) (mem. op., not designated for publication) (concluding that appellant's complaint that his trial counsel was ineffective for allowing two venirepersons, one who refused to state that he could follow the law and one who was friends with the prosecutor, after reasoning that without any testimony from trial counsel, "[w]e must presume defense counsel had a plausible reason for his actions" and that he acted within that range of reasonable professional assistance (citation omitted)).

Moreover, it is possible that trial counsel's conduct could have been grounded in legitimate trial strategy. For instance, trial counsel could have observed these jurors' facial expressions and attitude during voir dire and determined they were acceptable, including the fact that they both affirmatively stated that they could put aside their relationships. *See Hartwell v. State*, 476 S.W.3d 523, 533 (Tex. App.—Corpus Christi–Edinburg 2015, pet ref'd) (overruling appellant's second issue for failing to meet *Strickland's* first prong

13

that he was not afforded effective assistance because his trial counsel failed to challenge for cause or request a preemptory strike to remove a veniremen who had affirmatively stated he could not remain objective if shown graphic evidence after explaining that the reasons for trial counsel's conduct do not appear in the record, and it is possible that her conduct could have been grounded in legitimate trial strategy by observing the veniremen's facial expressions and attitude). Nonetheless, even if we assume appellant's trial counsel's performance was deficient, for failing to question venireperson 34 or use one of his preemptory strikes on this juror, appellant has not demonstrated he was prejudiced as the record does not reflect Brillo testified. *See Strickland*, 466 U.S. at 687. Accordingly, we overrule appellant's first sub-issue.

## 2.    Failure to Object to Extraneous Offense Evidence

By his second sub-issue, appellant contends that his trial counsel was ineffective for failing to object to extraneous offense evidence. He directs us to five points in the record where the "State mentions that [appellant] was on parole for a separate assault of the complainant and elicits testimony to the same effect." Our review of the record on these points shows that the State briefly referenced appellant being on parole during its opening statement; elicited testimony from O.B. that appellant had a prior felony conviction in March of 2020 for assault family violence with previous convictions in which she was the victim and that appellant was on parole when he came to her home,[8] moved into evidence the prior felony conviction[9] during O.B.'s testimony; and the State argued

---

[8] We also observe that the State referenced a 2005 judgment during O.B.'s testimony (in response to her prior answer) but also questioned O.B. on whether the judgment was the one recently discussed and our review of the record shows that to be the 2020 judgment.

[9] As referenced above, we observe a "Judgment of Conviction by Court – Waiver of Jury Trial" as

14

in closing that appellant was on parole, was a felon given the prior felony judgment conviction, and the jury should find him guilty of unlawful possession of a firearm by a felon based on those facts.

"To successfully assert that trial court's failure to object amounted to ineffective assistance of counsel, the applicant must show that the trial judge would have committed error in overruling such an objection." *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011). A trial court's ruling admitting extraneous-offense evidence will generally fall within the zone of reasonable disagreement. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

To obtain a conviction for unlawful possession of a firearm by a felon, the State had to present evidence of the prior felony conviction it alleged in the indictment because it is an element of the offense. *See* TEX. PENAL CODE ANN. §§ 46.04(a)(1) ("A person who has been convicted of a felony commits an offense if he possesses a firearm: after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony or the person's release from supervision under . . . parole, . . . whichever date is later[.]"), 1.07(23) (defining felon); *Ex parte Jimenez*, 361 S.W.3d 679, 683 (Tex. Crim. App. 2012) ("To obtain a valid conviction for unlawful possession of a firearm the State must prove a defendant's felony status at the time of the possession of the firearm."); *Tapps v. State*, 294 S.W.3d 175, 182 (Tex. Crim. App. 2009) (concluding appellant's previous conviction for a state-jail-felony offense provided sufficient evidence to satisfy the State's burden that appellant had been

---

State's Exhibit No. 12.

convicted of a felony under Section 46.04(a)(1) of the Texas Penal Code); *Mathew v. State*, 655 S.W.3d 291, 300 (Tex. App.—Corpus Christi–Edinburg 2022, pet. ref'd) ("[Appellant']s argument would mean that the State could never introduce evidence of a prior felony in a felony in a possession case until the punishment phase of the case. The predicate felony, however, is a basic element to these offenses and evidence regarding the same is therefore admissible." (internal citations and citations omitted)); *see also Villarreal v. State*, No. 03-16-00684-CR, 2017 WL 5985494, at *9 (Tex. App.—Austin Dec. 1, 2017, no pet.) (mem. op., not designated for publication) (noting "[t]he defendant's prior felony conviction is an essential, substantive element of the offense of unauthorized possession of a firearm by a felon that the State must prove to obtain a conviction." (citation omitted))*.*

Appellant could have stipulated to the prior felony conviction, which would have limited the State's ability to discuss and prove up the prior felony conviction. *See Old Chief v. United States*, 519 U.S. 172, 192 (1997) (precluding the government from proving what felony the defendant was convicted of if he chose to stipulate that he was indeed a felon in a unlawful possession of a firearm by a felon case); *see also Tamez v. State*, 11 S.W.3d 198, 202 (Tex. Crim. App. 2000) ("In cases, where the defendant agrees to stipulate to the two previous DWI convictions, we find that the proper balance is struck when the State reads the indictment at the beginning of trial, mentioning only the two jurisdictional prior convictions, but is foreclosed from presenting evidence of the conviction during its case-in-chief."); *see generally, Trevino v. State*, No. 13-14-00280-CR, 2015 WL 2160042, at *1 (Tex. App.—Corpus Christi–Edinburg May 7, 2015, no pet.) (mem. op., not designated for publication) (stipulating to prior felony conviction at trial on

16

unlawful possession of a firearm). But no such stipulation was made, and appellant does not claim on appeal that his trial counsel erred by failing to do so. Consequently, without a stipulation offered but refused by the State, the trial court would not have erred in admitting the extraneous offense evidence because the probative value of the evidence, i.e., proof of an element (a prior felony conviction) for an unlawful possession of a firearm by a felon offense, necessarily outweighed the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Old Chief*, 519 U.S. at 192; *Tamez*, 11 S.W.3d at 202–03 ("[A]ny prior convictions beyond the two jurisdictional elements should not be read or proven during the State's case-in-chief—as long as the defendant stipulates to the two prior convictions—as they are without probative value and can serve only to improperly prove the defendant's "bad character" and inflame the jury's prejudice."); *see generally, Garza v. State*, 213 S.W.3d 338, 347 (Tex. Crim. App. 2007) (concluding trial court did not abuse its discretion by admitting evidence of appellant's tattoos, i.e., requiring him to display them to the jury, because the tattoos were admissible to prove the "criminal street gang" element of the offense and their probative value was not outweighed by the danger of unfair prejudice).

Even if the extraneous-offense evidence was otherwise inadmissible, trial counsel's failure to object would not necessarily amount to ineffective assistance as the failure to object left the burden on the State to properly prove the conviction and the identity of the preparator. *See Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007); *see also Hodges v. State*, No. 05-16-00647-CR, 2017 WL 2391720, at *4 n.2 (Tex. App.—Dallas June 1, 2017, pet. ref'd) (mem. op., not designated for publication) (citation omitted). And while these are facially simple tasks, error in either might have been urged

17

as a basis for acquittal or reversal on appeal. *See, e.g., Strehl v. State*, 486 S.W.3d 110, 113–15 (Tex. App.—Texarkana 2016, no pet.) (modifying appellant's judgment for driving while intoxicated (DWI), third or more, to a conviction for a lesser included offense after concluding there was legally insufficient evidence linking the appellant to the second jurisdictional prior DWI offense); *see also Hodges*, 2017 WL 2391720, at *4 n.2.

Additionally, the trial court would not have erred in overruling an objection related to argument during opening or testimony elicited that appellant was on parole because, to validly indict a defendant for an unlawful possession of a firearm by a felon, the State must identify a particular event and then prove that event at trial. *See* TEX. PENAL CODE ANN. § 46.04(a)(1); *see also Trevino*, 2015 WL 2160042, at *5 ("To validly indict a person for this offense, the State must allege . . . at least one . . . identifiable events [—i.e., the felon's "release from confinement following conviction of the felony" or the felon's "release from supervision under community supervision, parole, or mandatory supervision, whichever date is later"—] occurred and that the felon possessed a firearm within five years of the latest such event. The State, having chosen to allege in the indictment that only one of the events occurred, had the burden to prove that particular event at trial." (internal citation and citations omitted)).

Furthermore, when balancing the factors, we conclude that the trial court would not have abused its discretion overruling a Rule 403 objection and concluding the evidence admissible. *See* TEX. R. EVID. 403; *See Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018) (stating "[t]he court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis,

18

(4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted"). To elaborate, while the evidence of appellant's prior felony conviction along with the evidence that he was on parole could lure the jury to convicting appellant based on his prior felony conviction, that evidence goes directly to matters that the State had to prove to obtain a conviction for unlawful possession of a firearm by a felon. *See* Tex. Penal Code Ann. § 46.04(a)(1); *See* Tex. R. Evid. 403; *Ex parte Jimenez*, 361 S.W.3d at 683. And our review of the record does not show that the State spent an inordinate amount of time developing this evidence. Indeed, when the State moved to admit the prior felony conviction, the testimony to do so took up a little over one page of the record. *See* Tex. R. Evid. 403.

Finally, the trial court would not have erred in overruling trial counsel's objection to the complained-of statements made by the State during its closing argument because our review of these statements shows they are proper jury argument in that they were made to summarize the evidence. *See Milton v. State*, 572 S.W.3d 234 (Tex. Crim. App. 2019) ("As we have often explained, proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to an argument of opposing counsel; and (4) plea for law enforcement."); *see also Guner v. State*, No. 13-23-00293-CR, 2024 WL 4784395, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 14, 2024, no pet.) ("Closing arguments serve to 'facilitate in the jury in properly analyzing the evidence presented at trial so that it may 'arrive at a just

19

and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence.'") (citations omitted)). And even if the statements were not proper jury argument, on this record, appellant has not rebutted the presumption that trial counsel's conduct was not sound trial strategy as the decision to object to particular statements during closing argument is a matter of trial strategy. *See Nicholson v. State*, 557 S.W.3d 559, 570 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (citation omitted). Accordingly, we overrule appellant's second sub-issue.

### 3. Failure to Provide Mitigation Evidence at Sentencing

By his third sub-issue, appellant contends that his trial counsel was ineffective for failing to provide mitigation evidence at his sentencing. He elaborates by directing us to two letters[10] in the clerk's record in which appellant mentions family as a support system and wanting to see his youngest daughter graduate from high school and his oldest son graduate from college; significant mental health issues since "[appellant] was found incompetent and 'restored' to competency during the pendency of his case;" O.B.'s filing of a non-prosecution affidavit which was not used to impeach her; O.B.'s frequent contact with appellant over the phone at the jail; a one paragraph closing; and lack of time to investigate from when trial counsel met appellant to his announcement of ready at trial.

Apart from the two letters in the clerk's record and appellant's closing argument, appellant provides no other record citations in this section for his numerous complaints related to his trial counsel's failure to provide mitigation evidence at sentencing, and we

---

[10] We observe one letter from appellant is addressed to "Judge Fortenberry," dated December 3, 2021, and the other is addressed to "Judge Hardin" dated April 23, 2022. In both, he also complains of a prior attorney, not the attorney representing him at his trial.

may not scour a record on appellant's behalf. *See generally*, *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) ("An appellate court has no obligation to construct and compose an appellant's issues, facts, and argument with appropriate citations to authorities and to the record.") (cleaned up); *Rodriguez*, 2018 WL 3635161, at *6. Regardless, neither of two letters[11] or the other complaints, without more, shed any light on his trial counsel's action or inaction, and thus, on this record appellant has failed to meet the first *Strickland* prong. *See Garza*, 213 S.W.3d at 348 (overruling appellant's fifth point whereby he alleges that his trial counsel rendered ineffective assistance because he failed to provide or offer any mitigating evidence during the punishment despite appellant's contentions that there were several witnesses available to provide such evidence and trial counsel's failure to offer evidence regarding his mental capacity after reasoning "[c]ounsel's reasons for his actions or intentions do not appear in the record, and his conduct could have been part of a reasonable strategy. Without more, we must defer to counsel's decision and deny relief."). For example, it is possible trial counsel contacted a family member or a friend of appellant but he or she declined to speak to appellant's trial counsel or was unwilling to testify. And while he directs us to *Lopez v. State*, a case in which our sister court reversed and remanded for a new punishment hearing after determining both *Strickland* prongs were met, we find the case distinguishable. 462 S.W.3d 180, 190 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Notably, in *Lopez,* a motion for new trial was filed and a hearing was held that included the submission of affidavits, including one from Lopez's trial counsel. *See id.* at 183–84.

---

[11] We observe that in both of the letters it appears appellant complains of a different trial counsel than the trial counsel he complains about in this appeal.

21

Here, appellant did file a handwritten motion for new trial which complained of his trial counsel, but there is no indication that a hearing on his motion was held, nor has he directed us to any affidavits which may support his claim. *See Hartwell*, 476 S.W.3d at 533*; see also Villarreal*, 2017 WL 5985494, at *7. Accordingly, we overrule appellant's third sub-issue. Having found that appellant failed to demonstrate ineffective assistance on any of his grounds, we overrule his first issue.

## III.    HARMLESS ERROR

Appellant next contends that the trial court reversibly erred by admitting unauthenticated hearsay evidence over his objection. He goes on to argue that the State did not supply sufficient facts to support a reasonable determination of authenticity or comply with the best evidence rule for State's Exhibit Nos. 5–10.

## A.    State's Exhibit Nos. 5–10

The challenged exhibits are photographs of text messages, and we have replicated the text exchanges within the photographs as follows:

- **State's Exhibit No. 5[12]**

    | [Person A]: | Man please hurry an find me a pistol |
    | [Person B]: | I'm looking |
    | | What's up now |
    | [Person A]: | I need one bad |
    | | I'm going to tell you the truth I'm going to kill [omitted]   I'm sick of that fake [*]ss bitch |

---

[12] Apart from modifications for profanity or as otherwise expressly noted as omitted, we have left grammar, spelling, and punctuation as it was shown in the text message exchange. We note that our labels of Person A and B are merely to aid in following a conversation format.

| [Person B]: | For who for what |
| | |
| | O ok. |

- **State's Exhibit No. 6**

| [Person A]: | Always trying to put the laws on me I'm just going to take her [*]ss out and get rid of the problem |
| | |
| | I put it on my mama and granny she dead now I can get one from around here but I don't [*]uck with nobody around here |
| [Person B]: | Just say way from her don't won't to see you go to Jail |
| [Person A]: | Don't worry about that kinfolk I'm going to do it either way this [*]itch was the reason those white folks tried to giv[13] me 25 to Life  look call me |

- **State's Exhibit No. 7**

| [Date and Time Shown]:[14] | 8/19/20 2:22 PM |
| [Person A]: | And then she act like she hasn't done anything so I'm going to make her pay for all that she has done |

- **State's Exhibit No. 8[15]**

| [Date and Time Shown]: | 8/19/20 2:22 PM |
| [Person A]: | And then she act like she hasn't done anything so I'm going to make her pay for all that she has done |

---

[13] We cannot tell from the way it is photographed whether there is an "e" at the end of this word.

[14] We note that above the date and time stamp it appears some of the prior messages from State's Exhibit No. 6 are shown.

[15] We observe that this photograph does not show the entire screen of the phone and depicts the date and time and one message that also appeared in State's Exhibit No. 7.

23

- **State's Exhibit No. 9**

  | | |
  |---|---|
  | [Date and Time Shown]: | 9/24/20 5:01 PM |
  | [Messaged Number]: | 979 274 9008 |
  | [Date and Time Shown]: | 9/24/20 5:12 PM |
  | [Person A]: | Well kinfolk I tried and I tried to keep my word, bro she is out of there, still dealing with the laws she dead bro on my mama and granny |
  | | I tried again and again kinfolk |
  | [Person]:[16] | Leave her alone, and go on with your life. |

- **State's Exhibit No. 10**

  | | |
  |---|---|
  | [Person B]: | Leave her alone, and go on with your life[17] |
  | [Date and Time Shown]: | 9/24/20 5:23 PM |
  | [Person A]: | I will kinfolk after I shoot her [*]ss |
  | [Date and Time Shown]: | 9/24/20 8:50 PM |
  | [Person B]: | Wht time you get off |
  | [Date and Time Shown]: | 9/24/20 9:20 PM |
  | [Person A]: | Now |

## B.  Applicable Law

### 1.  Authentication

To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. TEX. R. EVID. 901(a). "In a jury trial, it is the jury's role ultimately to

---

[16] We could not tell if the message came from Person A or B, so we left the exchange unlabeled.

[17] Again, we note this appears to be a message reflected in State's Exhibit No. 9.

24

determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). We review a trial court's ruling on authentication issues for abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Conclusive proof of authenticity before allowing admission of the disputed evidence is not required. *Id.*

### 2. Best Evidence Rule

The best evidence rule provides that an original writing, recording, or photograph is required to prove its content. *See* TEX. R. EVID. 1002. The best evidence rule requires that if contents of a writing are to be proved, it must be by the production, if possible, of the very writing itself. *See Ortiz v. State*, 651 S.W.2d 764, 766 (Tex. Crim. App. 1983). For electronically stored information, Rule 1001(d) defines an "original" as "any printout— or other output readable by sight—if it accurately reflects the information." TEX. R. EVID. 1001(d). When a "printout" or "other output" is not obtainable, Rule 1004(b) allows the content of the original to be proven through "other evidence" of its content. TEX. R. EVID. 1004(b).

### C. Analysis

Assuming without deciding that the trial court erred in admitting State Exhibit Nos. 5–10, we will evaluate whether appellant was harmed by their admission. *See Ellis v. State*, 517 S.W.3d 922, 931–92 (Tex. App.—Fort Worth 2017, no pet.). Any error in the trial court's admission of the photographs of the text messages would be nonconstitutional error, *see Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (applying Texas

Rule of Appellate Procedure 44.2(b) in analyzing whether appellant was harmed by admitting lay witnesses assumed improper opinion testimony); *see also Pinson v. State*, No. 05-23-00649, 2025 WL 1594379, at *4 (Tex. App.—Dallas, June 5, 2025, no pet.) (mem. op., not designated for publication) (addressing appellant's assertion that trial court erred in admitting text messages over his hearsay objections, appellate court presumed error and stated "[t]he erroneous admission of evidence is non-constitutional error that an appellate court disregards unless the error affects an appellant's substantial rights." (citation omitted)), so we apply Rule 44.2(b) and disregard error if it did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373 ("Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights.").

Error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict. *Gonzalez*, 544 S.W.3d at 373. "In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error. *Id.*

By the time the photographs of the text messages were offered and then admitted through O.B., she had already provided a detailed account of the events that transpired on October 25, 2020, including that appellant complained that he was tired of her "putting the laws in his life," that he "pull[ed] a gun out," that he threatened to "kill" her, and that he then threatened to "pistol whip" her. In other words, by the time the jury learned about the purported text messages, they had already learned that appellant was upset about

26

O.B. previously involving "the laws" in his life, had obtained a gun, and had threatened her. *See id.*; *see also Pinson*, 2025 WL 1594379, at *4 ("[E]vidence that Dixon and Pinson were in a dating relationship was admitted elsewhere without objection; therefore, the evidence in the text messages that Pinson was in a dating relationship with Dixon did not harm him.").

Additionally, while the jury may have found Nixon less credible given that his story changed, he did testify that appellant showed him a gun and he was "thinking about going to kill [his ex-wife]." And it was undisputed that a gun was located in the vehicle. Finally, while the State did reference the messages in its initial closing, the State did not focus its argument there. Instead, the State discussed several pieces of evidence during closing related to both offenses, and did not reference them in rebuttal. Under these circumstances, we have a fair assurance that the admission of the photographs of the text messages had but a slight effect on the jury's verdict; therefore, we do not find that appellant's substantial rights were affected. *See* TEX. R. APP. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373. Accordingly, we overrule appellant's second issue.

## IV.    CONCLUSION

We affirm the trial court's judgment.

JENNY CRON
Justice

Do not publish
TEX. R. APP. P. 47.2(b)

Delivered and filed on the
29th day of August, 2025.

27